STATE OF NEBRASKA, APPELLEE, V.
HERMAN D. BUCKMAN, APPELLANT.
675 N.W.2d 372

Filed March 5, 2004.   No. S-03-627.

Jerry L. Soucie, of Nebraska Commission on Public Advocacy, for appellant.

Jon Bruning, Attorney General, and Kimberly A. Klein for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

GERRARD, J.

Herman D. Buckman was charged with and subsequently found guilty of, pursuant to jury verdict, the first degree murder of Denise Stawkowski, and use of a weapon to commit a felony. He was also determined to be a habitual criminal. On March 2, 1989, Buckman was sentenced to life imprisonment on the murder conviction and to 20 to 60 years' imprisonment on the weapons charge, as enhanced by the habitual criminal statute, to be served consecutively to the sentence imposed for the murder. We affirmed Buckman's convictions and sentences on direct appeal, and later affirmed the district court's denial of Buckman's motion for postconviction relief. See *State v. Buckman*, 237 Neb. 936, 468 N.W.2d 589 (1991) (direct appeal), and *State v. Buckman*, 259 Neb. 924, 613 N.W.2d 463 (2000) (postconviction).

The present appeal arises from a request for deoxyribonucleic acid (DNA) testing brought by Buckman pursuant to the DNA Testing Act, Neb. Rev. Stat. § 29-4116 et seq. (Cum. Supp. 2002). An evidentiary hearing was held following DNA testing of certain forensic evidence from Buckman's trial, but the district court denied Buckman's motion to vacate and set aside his convictions, brought under § 29-4123(2), and his motion for new trial based on newly discovered evidence, brought under § 29-4123(3) and Neb. Rev. Stat. § 29-2101 et seq. (Cum. Supp. 2002). Buckman appeals from the denial of those motions, arguing that the district court erred in denying each of his motions.

## I. BACKGROUND

### 1. TRIAL EVIDENCE

The victim was found dead during the early morning hours of February 19, 1988, when a passer-by noticed her green, four-door Chevrolet in a roadside ditch in northwest Lincoln. The victim was found lying across the front seat of the car, dead from two gunshot wounds to the head. In *State v. Buckman*, 259 Neb. at 927-28, 613 N.W.2d at 469-70, we summarized the record established at Buckman's trial as follows:

> The record shows that at the time of her death on February 19, 1988, the victim was a 25-year-old wife and mother of four children. She was a drug dealer and a drug user who sold drugs to several people.
>
> The victim's husband testified that the victim began selling small quantities of methamphetamine to Buckman and Goldie Fisher in December 1987. The victim kept a record of her drug transactions in a blue trifold ledger, along with the drugs, money, and razor blades for dividing the drugs. In January 1988, Buckman and Fisher began to purchase cocaine from the victim. Buckman and Fisher paid for the drugs with cash or offered merchandise in exchange for the drugs.
>
> Shortly before the murder, Buckman became dissatisfied with either the quantity or quality of the drugs he was buying from the victim. On at least one occasion, Buckman threatened to steal any drugs the victim might have had.

The morning before the day of the murder, Buckman and Fisher traded a VCR for the balance due on an "eight-ball" of drugs received earlier in the week from the victim. Later that day, they were trying to sell leather jackets and baby clothes to get money to pay Fisher's babysitter. A few hours before the murder, they tried to sell or trade a ".38 Special" gun to the victim's husband for drugs. The same caliber gun was used to kill the victim.

It was established that when the victim was with Fisher at approximately 1 a.m. on February 19, 1988, the victim's purse contained roughly $2,000 and three eight-balls of cocaine. None of these items were found with the victim's body when it was discovered at approximately 3:20 the same morning. On February 19, after the murder, Buckman and Fisher spent large amounts of cash in Lincoln, but when they were arrested, the baby clothes and leather coats were still in Buckman's car. At that time, Buckman had $656 in cash in his possession.

Karen Niemann testified that she picked up Fisher, who was alone on a road near the location of the murder, at approximately 1:30 a.m. This was within the timeframe for the victim's death as set by the pathologist. Other evidence placed Fisher with Buckman immediately before and after the murder.

Certain evidence placed Buckman at the scene of the murder. There were bloodstains on his clothing and on the steering wheel cover and floormats in his car. A Kool cigarette butt was found in the victim's car, and a package of Kool cigarettes and brown slippers were found near the murder scene. A cellmate of Buckman's testified that Buckman bragged that he had killed the victim in the presence of Fisher and that he had used the money he stole from the victim to pay debts.

As part of the original investigation of the murder, the bloodstains mentioned above were tested by Dr. Reena Roy, who has a Ph.D. in molecular biology and biochemistry and postdoctoral training in proteins, enzymes, and nucleic acids. Roy was a forensic serologist with the Nebraska State Patrol and was the

supervisor of the forensic serology section. The cigarette butts were tested by Dr. Moses Schanfield, who has a Ph.D. in human genetics and postdoctoral training in immunology. Schanfield was certified as a clinical laboratory director and was director of a biogenetics laboratory.

Pursuant to Buckman's request under the DNA Testing Act, the bloodstains and cigarette butts were sent to the University of Nebraska Medical Center (UNMC), where they were tested at the human DNA identification laboratory. Further details concerning each of these items, including the trial testimony and results of subsequent DNA testing, are set forth below.

## 2. DNA-TESTED EVIDENCE

### (a) Black Leather Jacket

Buckman's clothing was seized when he was arrested, including his black leather jacket. Dr. Roy saw what she believed was blood on the jacket and cut out those areas of the fabric for analysis. Roy found blood on the jacket and concluded that the blood could not have come from Buckman, but could have come from the victim. Roy testified that she removed all the suspected bloodstains from the jacket and that she consumed all of the samples during her testing.

In the instant case, UNMC tested the jacket, and cuttings from the jacket, for hemoglobin. UNMC was unable to detect any blood on the jacket or the cuttings. As a result, no DNA testing was attempted on the jacket. DNA testing was attempted on the cuttings, but no DNA profile was recovered.

### (b) Yellow Sweater

A yellow sweater was seized from Buckman when he was arrested, and scrapings from possible bloodstains were tested. Dr. Roy found blood she concluded was not Buckman's, but could have been the victim's. Roy also found another area on the sweater that she believed was blood; the area tested positive for blood, but no further testing was conducted at the time. The scrapings were entirely consumed by the testing.

In the instant case, UNMC tested the sweater for hemoglobin and found none. DNA testing was performed on two stains on the sweater, but no DNA profile was found.

### (c) Black Jeans

Buckman's black jeans were seized when he was arrested and scrapings from possible bloodstains were presented to Dr. Roy, who opined that Buckman could be excluded as the source of the blood, but that the victim could not. All of the scrapings were consumed by the testing.

In the instant case, UNMC tested the jeans for hemoglobin, but found none. As a result, no DNA testing was attempted.

### (d) Black Leather Cap

Buckman's black leather cap was seized when he was arrested. Dr. Roy found blood on the cap, but the amount was too small to conduct further testing.

In the instant case, UNMC tested three areas on the leather cap for hemoglobin, but because the dye from the leather was the same color as the positive control for the blood tests, the results of the tests were uninterpretable. DNA testing was nonetheless performed, but no DNA profile was detected.

### (e) Brown Slippers

Investigators searched the area where the victim's car was found and discovered two brown suede slippers. One brown slipper was found on the shoulder of the road south of where the car was found, and the other was located in a nearby field. Evidence at trial suggested that Buckman was known to often wear slippers in public. Cuttings were taken from each brown slipper and tested by Dr. Roy, who excluded Buckman as the source of the blood, but found that the victim could not be excluded as the source of the blood. All the material extracted from the brown slippers was consumed during the testing.

In the instant case, UNMC tested the cuttings from each of the brown slippers for hemoglobin. The test on the cutting from the left brown slipper was negative, but the test for the cutting from the right brown slipper was a weak positive. DNA testing was performed on each of the cuttings, but no DNA profile was found.

At the original trial, Roy's opinion regarding the jacket, sweater, jeans, and brown slippers was based on her findings that the blood was blood group A and enzyme AK 2-1. It should be noted that identical bloodstains, containing blood group A

and enzyme AK 2-1, were found on the steering wheel cover and floormats of Buckman's Cadillac.

### (f) Cigarette Butts

A search of the victim's automobile revealed two smoked cigarette butts on the rear floorboard behind the passenger seat. One of the cigarette butts was identified as being a Kool cigarette, while the other was later identified as a Camel cigarette. In a field near the vehicle, investigators found a pair of blue house slippers, which were near an open package of Kool cigarettes, opened from the bottom. Evidence at trial indicated that Buckman smoked Kool cigarettes and opened his cigarette packages from the bottom. Testimony at trial also indicated that Fisher was known to often wear blue bedroom slippers, even in public.

Dr. Schanfield tested the cigarette butts as part of the original investigation. Schanfield tested the two cigarette butts and two control-group cigarettes, also Kool and Camel brand, for four different qualities: (1) A2M immunoglobin allotype, (2) KM immunoglobin allotype, (3) ABH blood group, and (4) Lewis blood group substance. These findings were compared to samples from Buckman, Fisher, and Eric Beckwith, the resident of the apartment outside which Fisher and Buckman were arrested.

The results of these tests were complicated by the possibility that each of the cigarettes might have been smoked by more than one person. Schanfield concluded that Buckman could not be excluded as the person who smoked the Kool and that if the Kool was smoked by only one person, Beckwith and Fisher were excluded as that person. Schanfield testified that the frequency of the qualities for which the cigarette butts were tested, listed above, was such that the qualities found on the Kool were found in 0.7 percent of the white population of the United States and 4.8 percent of the black population of the United States. With respect to the Camel cigarette, Schanfield was able to determine only that the victim and Beckwith were excluded as the smoker of the Camel, but that Fisher and Buckman were not.

In the instant case, the cigarette butts were presented to UNMC for testing in a plastic bag labeled as "Exhibit 114" at Buckman's original trial. At the trial, the bag had contained the two cigarette butts from the victim's car and the two control-group cigarettes.

When received by UNMC in the instant case, the bag contained seven commingled items, which were organized by UNMC and labeled as items 4A through 4G. UNMC attempted to extract DNA from each of the items, and a partial DNA profile was obtained from two of the items: 4B, a cigarette butt consisting of paper and a partial filter, and 4C, a cigarette butt consisting only of paper. No DNA profile was obtained from any of the other items. Because DNA testing had already been ordered and completed, the State did not argue, pursuant to § 29-4120(5), that the cigarette butts had not been retained under circumstances likely to safeguard the integrity of their original physical composition.

Item 4B appears to have come from a smoked cigarette, but it is impossible to determine if it came from the Kool or Camel cigarette. UNMC's testing indicated that the DNA on item 4B came from more than one individual. Buckman could have been a contributor of some of the alleles detected, but could not have been a contributor of some of the others. Dr. Ronald Rubocki, the director of the UNMC's human DNA identification laboratory, at one point opined that Buckman was not a contributor to the DNA found on item 4B. Rubocki later retreated from that opinion and characterized the results of the testing as "inconclusive."

Item 4C is from a Kool cigarette, apparently unsmoked—probably the control-group Kool cigarette. How the control-group cigarette would have come to have DNA on it is unknown, but could have resulted from the handling or storage of the contents of exhibit 114. The test results for item 4C were consistent with a partial profile from the victim, but also with a possible mixture from more than one individual. Buckman could have contributed some of the alleles found on item 4C, but could not have contributed some others. As with item 4B, the results of the testing of item 4C are best summarized as inconclusive.

### 3. DISTRICT COURT FINDINGS

The district court found, with respect to Buckman's jacket, sweater, and jeans, and the brown slippers, that it was questionable whether UNMC's findings were favorable to Buckman or material to the issue of his guilt. The court found no reasonable probability that any of the evidence from UNMC's testing of these items would have, if presented at trial, led to a different result.

Because UNMC was unable to derive any results from testing of the leather cap, the court found that there was no newly discovered evidence with respect to this item.

With respect to the cigarette butts, the court discussed the inconclusive nature of UNMC's results. The court found that although it was possible that UNMC's test results from cigarette butts 4B and 4C were favorable to Buckman and material to the issue of his guilt, there was no reasonable probability that presentation of that evidence to a trier of fact would have ended in a different result.

The court concluded that none of the evidence resulting from UNMC's testing exonerated, exculpated, or proved the innocence of Buckman; therefore, the court denied Buckman's motion to vacate and set aside his convictions. The court also concluded there was no reasonable possibility that presentation of UNMC's testing results at trial would have produced a different result. Thus, the court also denied Buckman's motion for a new trial.

## II. ASSIGNMENT OF ERROR

Buckman assigns, consolidated, that the district court erred in refusing to vacate his convictions and grant a new trial as provided in the DNA Testing Act and § 29-2101 et seq.

## III. ANALYSIS

### 1. STATUTORY FRAMEWORK OF DNA TESTING ACT

The factual findings of the district court are not disputed by the parties. Rather, the parties disagree about the legal significance of those findings. Buckman's motions for relief are brought pursuant to § 29-4123, which provides:

> (1) The results of the final DNA or other forensic testing ordered under subsection (5) of section 29-4120 shall be disclosed to the county attorney, to the person filing the motion, and to the person's attorney.

> (2) Upon receipt of the results of such testing, any party may request a hearing before the court when such results exonerate or exculpate the person. Following such hearing, the court may, on its own motion or upon the motion of any party, vacate and set aside the judgment and release the person from custody based upon final testing results exonerating or exculpating the person.

(3) If the court does not grant the relief contained in subsection (2) of this section, any party may file a motion for a new trial under sections 29-2101 to 29-2103.

Our disposition of this appeal is governed by the principles we recently articulated in *State v. Bronson, ante* p. 103, 672 N.W.2d 244 (2003). At oral argument, however, Buckman took issue with our holding in *Bronson.* Because Buckman's appearance at oral argument was his only opportunity to address our decision in *Bronson,* we choose to consider and respond to his arguments in that regard. See *State v. Mata,* 266 Neb. 668, 668 N.W.2d 448 (2003).

Buckman argues that *Bronson* interpreted the DNA Testing Act too restrictively, making it too difficult for a movant under the DNA Testing Act to obtain relief based on the results of DNA testing. Buckman's argument, as we understand it, is that a movant should be entitled to have his conviction vacated and set aside whenever the results of DNA testing show a reasonable probability that had the DNA evidence been available at trial, the result of the proceeding would have been different. Compare *Brady v. Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) (establishing standard for when constitutional due process is violated by prosecutorial failure to disclose evidence favorable to accused). However, Buckman's argument is not consistent with the legislative scheme established by the DNA Testing Act and does not account for the Legislature's express provision of separate remedies based upon differing results of DNA testing.

The initial step toward obtaining relief under the DNA Testing Act is for a person in custody to file a motion requesting forensic DNA testing of biological material. See § 29-4120. Forensic DNA testing is available for any biological material that is related to the investigation or prosecution that resulted in the judgment; is in the actual or constructive possession of the state, or others likely to safeguard the integrity of the biological material; and either was not previously subjected to DNA testing or can be retested with more accurate current techniques. See *id.* Once these thresholds are met, the court may order testing upon a determination that such testing was not effectively available at the time of trial, that the biological material has been retained

under circumstances likely to safeguard its integrity, and that the testing may produce noncumulative, exculpatory evidence relevant to the claim that the person was wrongfully convicted or sentenced. See *id*. See, generally, *State v. Poe*, 266 Neb. 437, 665 N.W.2d 654 (2003).

The most significant part of this process, for purposes of the current analysis, is the requirement that the testing "may produce noncumulative, exculpatory evidence relevant to the claim that the person was wrongfully convicted or sentenced." See § 29-4120(5). Exculpatory evidence is defined as evidence favorable to the person in custody and material to the issue of the guilt of the person in custody. § 29-4119. Contrary to Buckman's suggestion, this requirement is relatively undemanding for a movant seeking DNA testing and will generally preclude testing only where the evidence at issue would have no bearing on the guilt or culpability of the movant. See, generally, *State v. Lotter*, 266 Neb. 758, 669 N.W.2d 438 (2003).

Once DNA testing is conducted, and results are obtained, the question is whether the evidence obtained exonerates or exculpates the movant. Based on the test results, the movant may obtain relief in one of two ways, each of which requires a different quantum of proof. As previously noted, when the test results exonerate or exculpate the movant, the court may "vacate and set aside the judgment and release the person from custody." § 29-4123(2). However, if the court does not vacate and set aside the judgment, the movant may file a motion for new trial based upon "newly discovered exculpatory DNA or similar forensic testing obtained under the DNA Testing Act." See § 29-2101(6).

It would make little sense to conclude that the Legislature provided two separate remedies, but intended those remedies to be redundant. In construing a statute, a court must attempt to give effect to all of its parts, and if it can be avoided, no word, clause, or sentence will be rejected as superfluous or meaningless. *State v. Hamik*, 262 Neb. 761, 635 N.W.2d 123 (2001). Rather, the Legislature explained that the DNA Testing Act is intended to respond to two different circumstances. "Because of its scientific precision and reliability, DNA testing can, *in some cases*, conclusively establish the guilt or innocence of a criminal defendant. *In other cases*, DNA may not conclusively establish guilt or

innocence but may have significant probative value to a finder of fact." (Emphasis supplied.) § 29-4118(2). The Legislature further explained that DNA testing "can in some circumstances prove that a conviction which predated the development of DNA testing was based upon incorrect factual findings," but in other circumstances, "can provide a more reliable basis for establishing a correct verdict than any evidence proffered at the original trial." § 29-4118(4).

In construing a statute, an appellate court should consider the statute's plain meaning in pari materia and from its language as a whole to determine the intent of the Legislature. *Premium Farms v. County of Holt*, 263 Neb. 415, 640 N.W.2d 633 (2002). A preamble or policy statement in a legislative act is not generally self-implementing, but may be used, if needed, for assisting in interpreting the legislative intent for the specific act of which the statement is a part. See *Southern Neb. Rural P.P. Dist. v. Nebraska Electric*, 249 Neb. 913, 546 N.W.2d 315 (1996). When read in pari materia, both the language and expressed intent of the DNA Testing Act support the conclusion that the Legislature provided (1) an extraordinary remedy, vacation of the judgment, for the compelling circumstance in which actual innocence is conclusively established by DNA testing and (2) an ordinary remedy, a new trial, for circumstances in which newly discovered DNA evidence would have, if available at the former trial, probably produced a substantially different result. See *State v. Bronson, ante* p. 103, 672 N.W.2d 244 (2003).

Section 29-4123(2) provides that a court may vacate and set aside a judgment based on test results that "exonerate or exculpate" an accused. This is a greater remedy than merely granting a new trial and is logically intended to apply to those cases in which DNA test results "conclusively establish the guilt or innocence of a criminal defendant." See § 29-4118(2). This is reflected in the Legislature's use of the word "exonerate," which means "to relieve[,] esp. of a charge, obligation, or hardship . . . clear from accusation or blame." Webster's Third New International Dictionary of the English Language, Unabridged 797 (1993). Accord 5 The Oxford English Dictionary 548 (2d ed. 1989) (to "exonerate" is "to free from blame"). Clearly, the Legislature expected that a judgment would be vacated and set aside only

where the results of DNA testing either completely exonerated the movant or were highly exculpatory. In order to effectuate the Legislature's intent, we held in *Bronson, supra,* that the court should set aside and vacate a conviction only where (1) the DNA testing results exonerate or exculpate the person and (2) the results, when considered with the evidence of the case which resulted in the underlying judgment, show a complete lack of evidence to establish an essential element of the crime charged.

But as the Legislature noted, in other cases, "DNA may not conclusively establish guilt or innocence but may have significant probative value to a finder of fact." See § 29-4118(2). For those cases, where the evidence obtained is merely exculpatory, the Legislature provided a lesser but still effective remedy: a motion for new trial under § 29-2101 et seq. Section 29-2101 is the operative version of the statute governing new trials in criminal cases that has been in effect for well over a century. Compare Gen. Stat. ch. 58, § 490, p. 831 (1873). It is equally well established that a criminal defendant who seeks a new trial on the basis of newly discovered evidence must show that if the evidence had been admitted at the former trial, it would probably have produced a substantially different result. See, e.g., *State v. Atwater,* 245 Neb. 746, 515 N.W.2d 431 (1994). Compare *Ogden v. The State,* 13 Neb. 436, 438, 14 N.W. 165, 166 (1882) ("general rule as to newly discovered evidence may be stated thus: That if, with the newly discovered evidence before them, the jury should not have come to the same conclusion, a new trial will be granted").

At the same time it enacted the DNA Testing Act, the Legislature amended § 29-2101 to provide that "[a] new trial, after a verdict of conviction, may be granted, on the application of the defendant" based upon "(6) newly discovered exculpatory DNA or similar forensic testing evidence obtained under the DNA Testing Act." When legislation is enacted which makes related preexisting law applicable thereto, it is presumed that the Legislature acted with full knowledge of the preexisting law and judicial decisions of the Supreme Court construing and applying it. *In re Guardianship of Rebecca B. et al.,* 260 Neb. 922, 621 N.W.2d 289 (2000); *SID No. 1 v. Nebraska Pub. Power Dist.,* 253 Neb. 917, 573 N.W.2d 460 (1998). See, also, *Dalition v. Langemeier,* 246 Neb. 993, 524 N.W.2d 336 (1994). Because the

Legislature specifically provided that motions for new trial based on newly discovered exculpatory DNA evidence were to be brought under § 29-2101, we presume that the Legislature intended for our long-established interpretation of § 29-2101 to apply to those motions. Consequently, we held in *State v. Bronson, ante* p. 103, 672 N.W.2d 244 (2003), that to warrant a new trial, the district court must determine that newly discovered exculpatory evidence obtained pursuant to the DNA Testing Act must be of such a nature that if it had been offered and admitted at the former trial, it probably would have produced a substantially different result.

In short, the DNA Testing Act, and our decision in *Bronson, supra*, establish a clear procedural framework for movants seeking relief pursuant to the DNA Testing Act. First, a movant may obtain DNA testing if, inter alia, the testing may produce noncumulative, exculpatory evidence relevant to the claim that the person was wrongfully convicted or sentenced. See § 29-4120(5). Second, the court may vacate and set aside the judgment in circumstances where the DNA testing results are either completely exonerative or highly exculpatory—when the results, when considered with the evidence of the case which resulted in the underlying judgment, show a complete lack of evidence to establish an essential element of the crime charged. See, § 29-4123(2); *Bronson, supra*. This requires a finding that guilt cannot be sustained because the evidence is doubtful in character and completely lacking in probative value. Third, in other circumstances where the evidence is merely exculpatory, the court may order a new trial if the newly discovered exculpatory DNA evidence is of such a nature that if it had been offered and admitted at the former trial, it probably would have produced a substantially different result. See, §§ 29-4123(3) and 29-2101(6); *Bronson, supra*.

Having considered Buckman's arguments, we decline his invitation to reconsider our holdings in *Bronson, supra*, and conclude that the principles articulated in *Bronson* are controlling in the instant case. Based on those principles, we in turn address Buckman's arguments with respect to each of his motions in the district court.

### 2. Motion to Vacate and Set Aside Judgment

We explained in *Bronson, supra,* that a motion to vacate and set aside the judgment pursuant to § 29-4123(2) is similar to a motion to dismiss in a criminal case and that therefore, a standard comparable to that which is applied to a motion to dismiss in a criminal case should apply with respect to a motion under § 29-4123(2). We held that

> a court may properly grant a motion to vacate and set aside the judgment under § 29-4123(2) when (1) the DNA testing results exonerate or exculpate the person and (2) the results, when considered with the evidence of the case which resulted in the underlying judgment, show a complete lack of evidence to establish an essential element of the crime charged. This requires a finding that guilt cannot be sustained because the evidence is doubtful in character and completely lacking in probative value.

*State v. Bronson, ante* p. 103, 111, 672 N.W.2d 244, 250-51 (2003).

It is evident, without unnecessary elaboration, that none of the DNA testing results in this case meet the standard articulated in *Bronson, supra.* As did the district court, we question whether any of the DNA testing results can be said to exonerate or exculpate Buckman. But it is clear that those results, when considered with the evidence of the case resulting in Buckman's convictions, do not show a complete lack of evidence to establish any element of the crimes charged. The evidence from Buckman's trial, as summarized above, remains sufficient to establish all the elements of Buckman's convictions. As will be explained in further detail below, the DNA testing performed in this case does not serve to falsify or even undermine any of the evidence upon which Buckman's convictions were based. The district court correctly denied Buckman's motion to set aside or vacate the judgment against him pursuant to § 29-4123(2).

### 3. Motion for New Trial

As previously stated, to warrant a new trial, the district court must determine that newly discovered exculpatory evidence obtained pursuant to the DNA Testing Act must be of such a nature that if it had been offered and admitted at the former

trial, it probably would have produced a substantially different result. *Bronson, supra.* A motion for new trial based on newly discovered exculpatory evidence obtained pursuant to the DNA Testing Act is addressed to the discretion of the district court, and unless an abuse of discretion is shown, the court's determination will not be disturbed. *Bronson, supra.*

We first address the testing of bloodstains on Buckman's clothing. We note the similarity between the circumstances presented here and those presented in *Bronson, supra.* In *Bronson,* the defendant's fingerprint was found, apparently left in blood, on a vase located at the scene of a murder. Dr. Roy conducted a presumptive test for blood, which she testified was positive. Pursuant to the defendant's motion for DNA testing, the substance on the vase was tested by UNMC. The substance generated partial DNA profiles, but results regarding the contributors to those profiles were inconclusive. See *id.*

On appeal, the defendant in *Bronson* asserted that the DNA testing of the fingerprint failed to prove that it was made in his blood or the victim's blood, or even that the substance was human blood. We rejected the defendant's argument, stating in part:

> With respect to the vase, the DNA testing did not establish that the substance was not human blood. Furthermore, the DNA-tested evidence is not inconsistent with the evidence presented at trial which indicated that the substance likely was blood. . . .
>
> . . . .
>
> In sum, the DNA testing results do not warrant the relief [the defendant] seeks. The evidence obtained under the DNA Testing Act is not of such a nature that if it had been offered and admitted at the former trial, it probably would have produced a substantially different result.

*Bronson v. State, ante* p. 103, 114-15, 672 N.W.2d 244, 253 (2003).

In the instant case, UNMC's testing of Buckman's clothing was unable to discern the presence of blood. But this is entirely consistent with Dr. Roy's testimony that the scrapings of blood she obtained were entirely consumed by the testing conducted during the original investigation. UNMC's results do not verify the testimony and evidence adduced at Buckman's trial regarding

the bloodstains, but neither do they serve to discredit or falsify that testimony and evidence. The evidence obtained pursuant to the DNA Testing Act is not such that if it had been presented at Buckman's trial, it probably would have produced a substantially different result.

We now turn to the claim upon which Buckman primarily relies: that the DNA testing of the cigarette butts warrants a new trial. Buckman argues that Dr. Schanfield's opinion at his original trial was premised on the assumption that only one person smoked the Kool cigarette and that since the cigarettes that were tested for DNA each showed genetic material from multiple contributors, Schanfield's opinion is "now basically worthless." Brief for appellant at 24.

This argument overstates the reliability and import of the results from UNMC's testing of the cigarette butts. First, Buckman's argument is premised on an unproven assumption: that the genetic material found on the cigarette butts by UNMC accurately reflects the condition of the evidence when it was tested by Schanfield for the original investigation. This is not a safe assumption, however, given the method with which the evidence was stored and the inability to even identify the items tested by UNMC with reference to the exhibits from trial. Simply stated, by the time the cigarette butts reached UNMC, it had become impossible to tell which cigarette butt was which. Moreover, since the cigarette butts were all stored together, it cannot be assumed that the genetic material found on each cigarette was deposited there by a smoker. Testimony from Drs. Schanfield and Rubocki indicated that simply handling evidence can result in cross-contamination of genetic material.

Furthermore, even if we accept Buckman's contentions that more than one person smoked the cigarettes and that the cigarettes tested were the same cigarettes found in the victim's car, the most that can be definitively concluded is that at least one person other than Buckman contributed genetic material to the cigarettes. Schanfield testified at Buckman's trial that his testimony about the percentage of the population who could have smoked the cigarette, based on the percentage of the population who shared the immunoglobin allotypes and blood group substances found on the Kool cigarette, was premised on the assumption that only one

person smoked the cigarette. Schanfield testified that if more than one person smoked the cigarette, that interpretation would change. In other words, the jury at Buckman's trial was informed of the assumption that only one person smoked the cigarette, the possibility that more than one person smoked the cigarette, and the meaning attached to that possibility.

Finally, like the district court, we note the extremely inconclusive nature of UNMC's test results. The best assessment of those results is that Buckman can neither be included or excluded as being a contributor of some of the genetic material found on the tested cigarettes. The test results, especially when considering the problems created by the commingling of the evidence, defy meaningful interpretation.

In short, UNMC's inconclusive test results, obtained after the deterioration of the evidence, do not significantly undermine Dr. Schanfield's opinion at trial, which was based on test results obtained before the deterioration of the evidence. When viewed in relation to the evidence adduced at Buckman's trial, we cannot say that the district court abused its discretion in concluding that UNMC's test results, had they been offered and admitted at Buckman's trial, would probably not have produced a substantially different result. Buckman's assignment of error is without merit.

## IV. CONCLUSION

The district court did not err in denying Buckman's motion to vacate and set aside the judgment, and did not abuse its discretion in denying Buckman's motion for a new trial. The judgment of the district court is affirmed.

AFFIRMED.