IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STATE V. FAIR


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA, APPELLEE,

V.

JOHN H. FAIR, APPELLANT.


Filed August 22, 2017.    No. A-15-798.


Appeal from the District Court for Lancaster County: JOHN A. COLBORN, Judge. Affirmed.

Robert W. Kortus, of Nebraska Commission on Public Advocacy, for appellant.

Douglas J. Peterson, Attorney General, Erin E. Tangeman, and, on brief, Stacy M. Foust for appellee.


MOORE, Chief Judge, and INBODY and PIRTLE, Judges.

INBODY, Judge.

## INTRODUCTION

John H. Fair appeals from the order of the Lancaster County District Court overruling his motions to vacate his convictions or receive a new trial brought under the DNA Testing Act.

## STATEMENT OF FACTS

Fair was convicted by a jury of attempted second degree murder, attempted first degree assault on an officer, felon in possession of a deadly weapon, flight to avoid arrest, and two counts of use of a firearm to commit a felony. Fair was sentenced to a total of 41 to 67 years' incarceration. This court affirmed Fair's convictions and sentences on direct appeal. See *State v. Fair*, case No. A-03-288, 2004 WL 834097 (not designated for permanent publication) (*Fair I*). A detailed factual background is included in that opinion and we do not repeat it here. *Id*. Thereafter, Fair filed a motion for postconviction relief which was denied by the district court without an evidentiary

- 1 -

hearing, which decision was affirmed on appeal by this court by memorandum opinion. See *State v. Fair*, A-05-126 (2006) (*Fair II*).

On August 19, 2010, Fair filed a motion for DNA testing under the Nebraska DNA Testing Act. Pursuant to court order, the State filed its inventory in the case. Thereafter, Fair filed a motion to authorize DNA testing of exhibit 29, a black hooded sweatshirt; swabs from exhibit 29; and swabs from exhibit 47, the .357 revolver. The district court granted Fair's motion on July 13, 2011.

On August 17, 2012, Fair filed a pro se successive motion for postconviction relief claiming ineffective assistance of counsel and prosecutorial misconduct regarding the DNA testing. On December 4, Fair filed a motion to amend his motion for postconviction relief because he learned that his prior request under the DNA Testing Act "had not been brought to a conclusion." On February 7, 2013, upon the joint stipulation of the parties, the district court found that Fair was authorized to conduct DNA testing on exhibit 29, the black hooded sweatshirt.

On July 28, 2015, the district court filed an order denying Fair's motion to vacate under the DNA Testing Act; however, Fair had not filed a motion to vacate under DNA Testing Act. On August 5, Fair filed a motion to reconsider the court's July 28 order.

A hearing on Fair's motion to reconsider was held on August 6, 2015. The district court sustained Fair's motion to reconsider and vacated its July 28 order. During the hearing, Fair withdrew his pro se motion for postconviction relief, which was granted by the court. Fair was granted leave to file a motion for relief under Neb. Rev. Stat. § 29-4123(2) (Reissue 2016) for a hearing and an order that the results of the DNA testing exonerate or exculpate him or, alternatively, for a new trial under Neb. Rev. Stat. § 29-2101(6) (Reissue 2016) which he filed that same day. The parties agreed to proceed with evidence on Fair's motion to vacate or for a new trial. Fair renewed the presentation of evidence adduced at the previous hearing which included exhibit 96, judge's notes; exhibit 97, affidavit of Brian Wraxall of the Serological Research Institute (SERI) regarding DNA testing; exhibit 98, an affidavit of Jason Linder of the Nebraska State Crime Lab and attachment of the second analytical report from SERI regarding the testing of exhibit 29, the black sweatshirt; and exhibits 83 through 95, which consisted of the bill of exceptions of Fair's trial.

Exhibit 98 included the following conclusions by SERI regarding the testing of the black hooded sweatshirt:

1. DNA recovered from the inside middle back of the hood . . . is a mixture of at least four people. John Fair is <u>excluded</u> as a possible contributor to the major portion. No further interpretation will be offered for the minor/trace portion due to the low level results in this portion. No further interpretation will be offered for the minor/trace portion due to the complexity of the results of trace contributors by the major portion.

2. DNA recovered from the inside seams of the side and sleeves of sweatshirt jacket . . . is a mixture of at least three people. John Fair is <u>excluded</u> as a possible contributor to this mixture.

(Emphasis in original.)

Linder's affidavit set forth that that he averred with a reasonable degree of DNA scientific certainty that the analysis and conclusion set forth by SERI was scientifically correct, conditioned

upon the following important clarification: that, in respect to the conclusion expressed by SERI as to the hood of the black sweatshirt, "that no reasonable scientific conclusions or interpretations can be reached in respect to whether defendant, John Fair, is or is not a contributor to the minor/trace portion of the tested area of the inside middle back of the hood of the jacket."

On August 7, 2015, the Lancaster County District Court found the DNA evidence presented did not exclude Fair as the minor contributor to the DNA from the hood area of the sweatshirt and Fair was excluded as a contributor as to the DNA profiles found on the sleeves. The district court determined that, "at best," the DNA evidence was inconclusive and did not meet the standard for exculpatory or exonerating evidence. The district court concluded that the DNA evidence did not exonerate Fair and the DNA testing results did not conclusively establish Fair's innocence. The court adopted the factual findings as set forth in this court's decision in *Fair I, supra*, but set forth the following facts which the court deemed were necessary to consider the context of exhibit 29 at trial:

During the early morning hours of February 20, 2002, Lincoln police officer Jeffery Urkevich saw a Cadillac speeding on Sun Valley Boulevard, in Lincoln, Nebraska. The officer pulled behind and began a traffic stop. As the officer approached the vehicle, he was able to see the driver from behind for a brief interval and also the side of the driver's face. The officer testified that he saw an (sic) Hispanic male, wearing no hat and having short dark hair and no facial hair. The officer testified that the driver was wearing a "dark bluish, almost black, sweater or sweatshirt of some kind." The officer did not view the face from a straight-on position. The hands of the driver remained fixed to the steering wheel. The car was not in park. As the officer neared the door portion of the car and began to bend over, the driver accelerated and fled the scene. The total time for this encounter was less than 30 seconds.

Officer Urkevich returned to his police cruiser and chased the suspect. The Cadillac hit a sign at First and Adams Streets and came to a halt in a grass area. Officer Urkevich's vehicle came to a stop about 1.5 to 2 car lengths behind it. The driver of the Cadillac was already out of the vehicle and was fleeing. As the officer exited his cruiser the driver of the Cadillac fired a weapon in the direction of the officer. The officer made additional observations as the suspect fled the crash scene. During this interval the closest the officer was to the suspect was approximately 20 yards. The officer told dispatch that the suspect was an (sic) Hispanic male in his mid-twenties, 5 feet 8 inches or 5 feet 10 inches tall, wearing a dark sweatshirt and blue running pants with three white stripes down the side. Officer Urkevich acknowledged that being shot at was an intense situation that left him in an excited state.

At trial, Officer Urkevich was presented with both Exhibit 28 which is a lighter blue sweatshirt with no hood and Exhibit 29 which is a dark hooded sweatshirt. Officer Urkevich had no recollection of seeing Exhibit 28 that night but was certain that the suspect he was chasing was wearing Exhibit 29.

Officer Urkevich maintains that he did not have a problem seeing the suspect and identified Mr. Fair as the driver of the Cadillac and the person that fired shots at him. The officer was confident and unequivocal in making that identification.

With respect to establishing who was driving the car when Officer Urkevich made his traffic stop and who fired the shots at him a short while later, the eyewitness testimony of Officer Urkevich was a critical source of information that was presented to the jury.

There is a trailer park located at First and Adams Street. Upon hearing on the radio that shots had been fired, other law enforcement officers converged on the area. Officer Todd Kocian was one of those officers and joined other officers in setting up a perimeter. While doing so, Officer Kocian saw an individual walking just inside the entrance of the park. The officer turned on his spotlight and the person ran away. A chase followed. Other evidence, including Mr. Fair's own testimony establishes that the person Officer Kocian saw and chased was Mr. Fair.

Mr. Fair testified . . . that he was living in the trailer park, that he was out walking, and that when he saw law enforcement officers that he ran back to his trailer.

Officers Robert Smith and Sergeant Donald Scheinost pursued Mr. Fair to the trailer and apprehended him. He was wearing blue running pants with stripes down the sides, a white tank top and white socks. Other occupants in the trailer established that when Mr. Fair arrived he took off his shoes and socks in a back bedroom. Mr. Fair was placed in a cruiser. Officer Urkevich was brought to the cruiser, and the officer identified Mr. Fair as the suspect he initially stopped, pursued, and who shot at him.

Mr. Fair's trial testimony confirms that he has worked on the black Cadillac earlier in the week. He denied that he was present when that vehicle was stopped by Ofc. Urkevich. He stated that he did not flee from the traffic stop and did not crash it on February 20, 2002. He admitted that several of the items of clothing recovered from the trailer where he was arrested were his. He denied that he had ever worn Ex. 29.

The court found that the DNA results did not "either falsify the testimony of Officer Jeffrey Urkevich or discredit his testimony to such a degree that Mr. Fair is eliminated as a possible perpetrator of the crimes for which he was convicted."

The district court also concluded that the DNA evidence did not exculpate Fair "in such a manner that would require a new trial." It found that the DNA results did not rule out the possibility that Fair was wearing the black sweatshirt at the time of the commission of the offenses. The court further found the DNA evidence "inconclusive[] and given the strength of Officer Urkevich's identification of Mr. Fair, coupled with the strong circumstantial evidence presented during the trial . . . it is unlikely the results of the DNA testing would produce a substantially different result if Mr. Fair was granted a new trial." Accordingly, the district court overruled both Fair's motion to vacate and his motion for a new trial. Fair has timely appealed to this court.

## ASSIGNMENTS OF ERROR

Fair assigns as error that the district court (1) abused its discretion in considering and relying on inconclusive DNA testing results; (2) erred in overruling his motion to vacate; and (3) erred in overruling his motion for new trial under the DNA Testing Act.

## STANDARD OF REVIEW

Under the DNA Testing Act, an appellate court will not reverse a trial court's order determining a motion to vacate a judgment of conviction or grant a new trial absent an abuse of the trial court's discretion. *State v. Parmar*, 283 Neb. 247, 808 N.W.2d 623 (2012). Under the DNA Testing Act, an appellate court will uphold a trial court's findings of fact unless such findings are clearly erroneous. *Id*.

## ANALYSIS

### BACKGROUND OF DNA TESTING ACT

Before addressing Fair's assigned errors, we first provide a background of the DNA Testing Act. Pursuant to Neb. Rev. Stat. § 29-4120(1)(a) (Reissue 2008), a convicted person in custody may request DNA testing of biological material that was related to the investigation or prosecution that resulted in judgment. See *State v. Parmar*, 283 Neb. 247, 249, 808 N.W.2d 623, 626 (2012). (We note that although § 29-4120 was amended in 2015, that amendment is not applicable to the instant case.) If the court authorizes testing, then under Neb. Rev. Stat. § 29-4123(2) (Reissue 2016), any party may request a hearing when the DNA testing exonerates or exculpates the person in custody. See *State v. Parmar*, *supra*.

> In enacting the DNA Testing Act, the Legislature intended to provide (1) an extraordinary remedy--vacation of the judgment--for the compelling circumstance in which actual innocence is conclusively established by DNA testing and (2) an ordinary remedy--a new trial--for circumstances in which newly discovered DNA evidence would have, if available at the former trial, probably produced a substantially different result.

> Thus, to warrant an order vacating a judgment of conviction under the DNA Testing Act, the movant must present DNA testing results that, when considered with the evidence presented at the trial leading to conviction, show a complete lack of evidence to establish an essential element of the crime charged.

*State v. Parmar*, 283 Neb. 247, 245, 808 N.W.2d 623, 629 (2012); Neb. Rev. Stat. § 29-4123(2) (Reissue 2016). However, to warrant an order for a new trial under the DNA Testing Act, the movant must present DNA testing results that probably would have produced a substantially different result if the evidence had been offered and admitted at the movant's trial. *State v. Parmar, supra*; see Neb. Rev. Stat. § 29-2101(6) (Reissue 2016) (permitting a defendant to apply for a new trial for specified reasons that materially affect the defendant's substantial rights including "newly discovered exculpatory DNA or similar forensic testing evidence obtained under the DNA Testing Act").

An action under the DNA Testing Act is a collateral attack on a conviction and is civil in nature; therefore, the burden of proof is upon the defendant. *State v. Young*, 287 Neb. 749, 844 N.W.2d 304 (2014).

Fair's first assignment of error is that the district court abused its discretion in relying on inconclusive DNA testing results which would have been inadmissible if said results had been presented at his trial. Brief for appellant at 20. Fair was excluded as the major source of any biological material in the hood of exhibit 29, was excluded as the source of any biological material in the sleeve of that garment, and the evidence was inconclusive regarding whether Fair was a contributor to the minor/trace portion of the tested area of the inside middle back of the hood of the sweatshirt.

Fair's claim that inconclusive evidence could not be considered by the district court in determining a movant's motion to vacate and/or motion for new trial under the DNA Testing Act has been rejected by the Nebraska Supreme Court in *State v. Poe*, 271 Neb. 858, 717 N.W.2d 463 (2006); *State v. Buckman*, 267 Neb. 505, 675 N.W.2d 372 (2004); and *State v. Bronson*, 267 Neb. 103, 672 N.W.2d 244 (2003).

In *State v. Poe*, 271 Neb. 858, 717 N.W.2d 463 (2006), the defendant moved for postconviction DNA testing of a cigarette butt found at the scene of the robbery. DNA testing was granted and the resulting report came back inconclusive. Following a hearing, the district court held that, for the purposes of the DNA Testing Act, the test results were not exculpatory because the movant could not be excluded as the contributor to male biological material found on the cigarette butt and dismissed Poe's action. *State v. Poe, supra*.

Similarly, in *State v. Buckman, supra*, the defendant moved for DNA testing of bloodstains on his clothing and cigarette butts from the initial investigation resulting in his convictions of first degree murder and use of a weapon to commit a felony. DNA testing was granted and the testing was unable to discern the presence of blood which was consistent with prior testimony that blood scrapings found were entirely consumed during testing conducted during the initial investigation. Further, the court found that the test results regarding the cigarettes were "inconclusive" because the defendant "could neither be included nor excluded as being a contributor of some of the genetic material found on the tested cigarettes." *Id*. at 522, 675 N.W.2d at 385. Thus, the DNA testing results did not exonerate or exculpate the defendant and the district court did not abuse its discretion in denying the defendant's motion to vacate and motion for a new trial. *Id*. at 522, 675 N.W.2d at 386.

In *State v. Bronson*, *supra*, the defendant's fingerprint was found, apparently left in blood, on a vase located at the scene of a murder and a presumptive test for blood tested positive. Pursuant to the defendant's request for DNA testing, the substance on the vase was tested and generated partial DNA profiles, but the results regarding the contributors to those profiles were inconclusive. *Id.* at 107, 672 N.W.2d at 248. On appeal, the defendant asserted that the DNA testing of the fingerprint failed to prove that it was made in his blood, the victim's blood, or even that the substance was human blood. *Id*. The Nebraska Supreme Court rejected the defendant's argument finding that the DNA testing was not inconsistent with the evidence presented at trial which indicated that the substance found on the vase likely was blood and that the evidence obtained under the DNA Testing Act was not of such a nature that if it had been offered and admitted at the former trial, it probably would have produced a substantially different result.

In sum, after DNA Testing is ordered pursuant to the DNA Testing Act, the district court must then determine, based upon all of those results obtained, whether the results exonerate the movant, whether the results are exculpatory, or whether the results are neither. Fair requested DNA testing which was performed. The district court was then required to consider the results which were returned, including whether the results were inconclusive. Thus, this assignment of error is without merit.

MOTION TO VACATE UNDER DNA TESTING ACT

Fair also contends that the district court erred in overruling his motion to vacate because the "testing results from the examination of Exhibit 29 conclusively establish his innocence." Brief for appellant at 22. Fair argues that Officer Urkevich testified that the suspect, who he identified as Fair, was wearing exhibit 29 on February 29, 2002, but "the DNA test results rule out that his DNA is present on Exhibit 29" and that "[t]he tension between those points cannot be reconciled." Brief for appellant at 23.

"[P]ostconviction DNA evidence that does not falsify or discredit evidence that was necessary to prove an essential element of the crime does not exonerate the movant." *State v. Parmar*, 283 Neb. 247, 255, 808 N.W.2d 623, 629 (2012). "[P]ostconviction DNA testing results that are not incompatible with trial evidence of the movant's guilt fail to exonerate the movant of guilt." *Id.* at 257, 808 N.W.2d at 631.

As noted, the district court ruled that Fair was not entitled to have his convictions vacated because the DNA testing results did not conclusively establish his innocence. Further, the DNA testing results do not either falsify or discredit Officer Urkevich's testimony to such a degree that Fair is eliminated as a possible perpetrator for the crimes for which he was convicted. Additionally, the evidence from Fair's trial remains sufficient to establish all the elements of his convictions. Therefore, we conclude that the trial court did not abuse its discretion in denying Fair's motion to vacate under the DNA Testing Act.

MOTION FOR NEW TRIAL UNDER DNA TESTING ACT

Finally, Fair contends that the district court erred in overruling his motion for new trial under the DNA Testing Act.

"[T]o warrant a new trial under the DNA Testing Act, the movant must present DNA testing results that probably would have produced a substantially different result if the evidence had been offered and admitted at the movant's trial." *State v. Parmar*, 283 Neb. at 257, 808 N.W.2d at 631. "[P]ostconviction DNA evidence probably would have produced a substantially different result at trial if the evidence (1) tends to create a reasonable doubt about the defendant's guilt and (2) 'does not merely impeach or contradict [the key eyewitness'] testimony, but is probative of a factual situation different from that to which [the witness] testified.'" *Id.* at 260, 808 N.W.2d at 632-33 quoting *People v. Waters*, 328 Ill. App. 3d 117, 764 N.E.2d 1194 (2001).

Fair points to *State v. Johnson*, 290 Neb. 862, 862 N.W.2d 757 (2015), to support his argument, stating that if his case were retried, evidence of exclusion could not be considered at a new trial. In *State v. Johnson, supra*, the Nebraska Supreme Court held that, unless the State presents the statistical significance of DNA testing results that shows a defendant cannot be

excluded as a potential source in a biological sample, the results are irrelevant because they do not help the fact finder assess whether the defendant is or is not the source of the sample. Because of the significance that jurors will likely attach to DNA evidence, the value of inconclusive testing results is substantially outweighed by the danger that the evidence will mislead the jurors. However, *State v. Johnson, supra*, concerned the direct appeal of a jury trial, not an appeal after DNA testing.

Further, although Fair claims that the DNA test results are inconsistent with Urkevich's testimony that the suspect, who Urkevich identified as Fair, wore exhibit 29, brief for appellant at 23-25, the most distinct item of clothing worn by the suspect was blue pants with white stripes down the sides. A number of witnesses, including Urkevich and two other officers, consistently described the suspect's pants as being blue pants with white stripes. Fair was wearing blue pants with white stripes down the sides when he was taken into custody.

The DNA testing performed in this case does not serve to falsify or even undermine any of the evidence upon which Fair's convictions were based. We note that exhibit 29 was not even mentioned in our opinion regarding the sufficiency of the evidence to support his convictions in his direct appeal. *Fair I,* case No. A-03-288, 2004 WL 834097 (not designated for permanent publication). As we set forth in our consideration of this issue in *Fair I, supra*,

> Urkevich testified that Fair was the man who drove the Cadillac, fled the traffic stop, fired shots at Urkevich, then fled the scene and was apprehended at the trailer. Urkevich provided dispatch with a description of the suspect who fired the shots and fled the scene. Within a short time and not far from the scene of the shooting, other officers pursued and captured Fair, who matched the description given by Urkevich and was carrying .357 caliber ammunition on his person. Officers then recovered a .357 revolver near the scene.

In sum, the DNA evidence is not of such a nature that it probably would have produced a substantially different result if it had been offered and admitted at trial and the court did not abuse its discretion in denying Fair's motion for a new trial.

CONCLUSION

The district court did not err in considering the DNA results, including those results that were inconclusive. Further, the district court did not abuse its discretion in denying Fair's motion to vacate and motion for a new trial, and the decision of the district court is affirmed.

AFFIRMED.