Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
02/22/2019 08:07 AM CST

State of Nebraska, appellee, v.
James E. Myers, appellant.
___ N.W.2d ___

Filed November 30, 2018.    No. S-18-239.

1. **DNA Testing: Appeal and Error.** A motion for DNA testing is
   addressed to the discretion of the trial court, and unless an abuse
   of discretion is shown, the trial court's determination will not be
   disturbed.
2. ____: ____. An appellate court will uphold a trial court's findings of
   fact related to a motion for DNA testing unless such findings are clearly
   erroneous.
3. ____: ____. Decisions regarding appointment of counsel under the
   DNA Testing Act are reviewed for an abuse of discretion.

Appeal from the District Court for Douglas County: J.
Michael Coffey, Judge. Reversed and remanded for further
proceedings.

James E. Myers, pro se.

Douglas J. Peterson, Attorney General, and Kimberly A.
Klein for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, and
Papik, JJ.

Cassel, J.

## INTRODUCTION

Nearly 20 years after a jury convicted James E. Myers of
murder, he filed a motion for testing under the DNA Testing

Act.[1] The district court denied that motion as well as Myers' motion for the appointment of counsel. We would review these denials for an abuse of discretion. But to do so, the court below must have applied only the part of the legal framework governing whether to grant testing. Because the district court may have relied instead upon principles governing relief available after testing, we must reverse the order and remand the cause for reconsideration of the motions under only the correct portion of the governing framework.

## BACKGROUND

### Circumstances of Crimes

The State charged Myers with first degree murder, use of a deadly weapon in the commission of a felony, and possession of a deadly weapon by a felon in connection with the 1995 shooting death of Lynette Mainelli. A jury convicted Myers of the charges, and we affirmed his convictions on direct appeal.[2]

The factual background relating to Myers' convictions is set forth in more detail in our opinion involving Myers' direct appeal.[3] Our opinion stated in part:

> Edward Wilson testified that he was in the van driven by Myers the night Mainelli was killed. Myers drove to the Blue Lake Manor Apartments, where Mainelli lived. Myers got out of the van, and Edward Wilson saw that he had on gloves. Myers went to the back of the van, and Edward Wilson heard a "clacking" noise, which he recognized as the sound of a bullet moving into a chamber. Myers then left the van and walked toward the apartment complex. He was gone for about 1 hour, and upon his return, he got in the van and took the passengers home.

---

[1] See Neb. Rev. Stat. §§ 29-4116 to 29-4125 (Reissue 2016).

[2] See *State v. Myers*, 258 Neb. 300, 603 N.W.2d 378 (1999).

[3] *Id.*

Sam Edwards testified that as Myers dropped him off, Myers gave him a handgun and told him to "put it up" because the police were out and Myers had in-transit stickers on the van. Earlier, Edwards had seen the pistol on Myers' lap. Edwards subsequently retrieved the pistol and gave it to Edward Wilson, who stated the pistol had once belonged to his sister, Edwina Wilson. Edward Wilson testified that he recognized the gun because it had a unique color and a name written on it and that he thought the black handle was unusual. Edward Wilson sold the pistol because he suspected that it had been used in the murder of Mainelli. The pistol was the same caliber as two .22-caliber casings found beside Mainelli's body. Daniel Bredow, a firearm toolmarks examiner with the city of Omaha, testified that he compared the bullets found at the crime scene with bullets fired from the gun Myers gave Edwards. Bredow concluded that the bullets taken from the crime scene had been fired by the gun which could be traced to Myers.

[Timothy] Sanders testified that in the summer and early fall of 1995, Myers had said that Mainelli was going to testify against Charles Duncan, so she needed to have "her cap pulled back and to be shot." Sanders saw Myers with a small .22-caliber handgun in the summer of 1995. Edwina Wilson testified that in December 1996, after Mainelli's death, Myers had told her to tell the police he was with her at the time of the killing.[4]

Other information relevant to the instant appeal is derived from the trial record. The State presented evidence about Myers' plan to be intimate with Mainelli. Timothy Sanders, who was in the same gang as Myers, testified that Myers said Mainelli needed to be shot and that Myers said he was going to have sex with Mainelli. Sanders testified that after Mainelli's death, Myers told him that Mainelli walked into

---

[4] *Id.* at 312-13, 603 N.W.2d at 388-89.

her bedroom, took off her clothes, laid on the bed, and Myers shot her once the lights were out. In closing arguments, the prosecutor summarized: "She took off her clothes; she laid on the bed. He put the gun towards her temple and he shot her."

## MOTION FOR DNA TESTING

In 2016, Myers filed a motion pursuant to the DNA Testing Act seeking "DNA testing of items of evidence that may contain biological material." He listed 26 items of evidence taken from the crime scene, and he wished to have those items tested in order to exclude himself as a donor of any biological material. The items included Mainelli's bedding, bullets and spent .22-caliber casings, beverage containers, clothing, spiral notebooks, cigarette butts and contents of ashtrays, gunshot residue test kit from Mainelli's hands, vials of Mainelli's blood, a rape kit, and hair samples.

Myers sought a variety of different DNA tests. He wanted testing of any hairs, blood, semen, saliva, or skin cells on various items, asserting that if such DNA evidence excluded Myers and was found to be of another male, "this would prove that the story from the informant was false, and Myers is in fact [i]nnocent." Myers alleged there was "good cause to believe biological evidence still exists and can be identified and profiled with today's DNA technology." Myers asserted that if a suspect touched his face or head while wearing gloves, the skin cells could be transferred to other objects. Myers wanted the spent .22-caliber casings tested, because "it has become possible to obtain DNA profiles from few skin cells left by the person who loaded a shell into a gun." Myers also moved for the appointment of counsel. In connection with a motion to preserve evidence, Myers included a laboratory report showing that a sexual assault examination of Mainelli was performed and that a vaginal swab and vaginal smear slide from a sexual assault kit revealed "[v]ery few spermatozoa."

Myers filed an affidavit in support of his motion for DNA testing. He stated that DNA evidence was not available at the

time of his trial, that law enforcement withheld any findings of biological evidence from him, and that testing all of the items would exonerate him. Myers also stated that he was with his girlfriend on the night of the murder and that testing all of the items would prove that the State's informant lied. He subsequently filed a supplemental amendment to his motion, seeking DNA testing of the sexual assault kit.

The State filed an inventory of evidence that had been gathered in connection with the case. It showed that the items Myers wished to have tested were in the State's possession.

The district court held a hearing. Myers asked the court to consider his motion along with the supplemental amendment and to take judicial notice of § 29-4120(5). He presented no evidence. The State likewise presented no evidence, but it requested that the court review the bill of exceptions from the trial, along with Myers' motion to determine whether DNA testing was appropriate.

## DISTRICT COURT'S DECISION

The district court denied Myers' motion. It found that DNA testing was not warranted under § 29-4120(5)(c), because the results would not provide exculpatory evidence. The court quoted extensively from a portion of *State v. Buckman*[5] (including portions of the *Buckman* opinion which relied on *State v. Bronson*[6]) where we discussed when a court may vacate and set aside a judgment based on test results that "exonerate or exculpate" an accused and "show a complete lack of evidence to establish an essential element of the crime charged."

The court explained that testing of the evidence would not exonerate or exculpate Myers in light of the evidence at trial, because "the absence of [Myers'] DNA from these items would not establish [Myers'] innocence considering witnesses

---

[5] *State v. Buckman*, 267 Neb. 505, 517, 675 N.W.2d 372, 382 (2004).

[6] *State v. Bronson*, 267 Neb. 103, 672 N.W.2d 244 (2003).

testified he intentionally wore gloves that would prevent his DNA from being left at the scene." The court reasoned that "the absence of [Myers'] DNA or the presence of another person's DNA at the scene on those items would not alone be enough to exonerate [Myers] considering his motive for the crime, inculpatory statements made and witness testimony regarding his actions directly before and after the murder." Further, the court stated that testing of a sexual assault kit would not exonerate or exculpate Myers, because the State did not argue that Myers had sex with Mainelli on the night of the murder. The court concluded that "regardless of whether [Myers'] DNA was excluded or someone else's DNA could be found on this evidence, such DNA results would not 'show a complete lack of evidence to establish an essential element of the crime charged' when you consider the totality of the evidence."

Myers timely appealed.

ASSIGNMENTS OF ERROR

Myers assigns that the district court erred in (1) refusing to order DNA testing, (2) making findings of fact and conclusions of law without actual DNA results, (3) failing to determine whether the State refused to allow him access to DNA evidence, and (4) failing to appoint counsel to represent him.

STANDARD OF REVIEW

[1,2] A motion for DNA testing is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed.[7] An appellate court will uphold a trial court's findings of fact related to a motion for DNA testing unless such findings are clearly erroneous.[8]

---

[7] *State v. Betancourt-Garcia*, 299 Neb. 775, 910 N.W.2d 164 (2018).

[8] *Id.*

[3] Decisions regarding appointment of counsel under the DNA Testing Act are reviewed for an abuse of discretion.[9]

## ANALYSIS

### Motion for DNA Testing

In denying Myers' motion for DNA testing, the district court relied in large part on our decision in *Buckman*.[10] We agree that *Buckman* is instructive regarding the showing that must be made at various stages. But it is also important to remember that both *Buckman* and the *Bronson*[11] decision cited in *Buckman* were appeals where DNA testing had been ordered and focused on the relief sought and denied based upon the test results.

In *Buckman*, we first summarized the legal framework applicable in determining *whether* to order testing. We said:

> The initial step toward obtaining relief under the DNA Testing Act is for a person in custody to file a motion requesting forensic DNA testing of biological material. . . . Forensic DNA testing is available for any biological material that is related to the investigation or prosecution that resulted in the judgment; is in the actual or constructive possession of the state, or others likely to safeguard the integrity of the biological material; and either was not previously subjected to DNA testing or can be retested with more accurate current techniques.[12]

We pause at this point to observe there is no dispute that Myers met these criteria.

If the above criteria are met and if the court further determines that the requirements of § 29-4120(5) have been met, the court must order testing. Although our *Buckman* opinion

---

[9] *State v. Phelps*, 273 Neb. 36, 727 N.W.2d 224 (2007).

[10] *State v. Buckman, supra* note 5.

[11] *State v. Bronson, supra* note 6.

[12] *State v. Buckman, supra* note 5, 267 Neb. at 514, 675 N.W.2d at 380 (citation omitted).

used permissive "may order testing"[13] language, we have sub-
sequently made clear—consistent with the statute's use of the
phrase "shall order DNA testing"[14]—that the court is required
to order testing if the requirements of § 29-4120(5) are met.[15]
We recognize the Legislature has amended § 29-4120(5) since
the time of the *Buckman* decision, but the amendment is
not significant to the issue before us. For convenience, we
quote the current version, which was in effect at the time of
Myers' motion:

> Upon consideration of affidavits or after a hearing, the
> court shall order DNA testing pursuant to a motion filed
> under subsection (1) of this section upon a determination
> that (a)(i) the biological material was not previously sub-
> jected to DNA testing or (ii) the biological material was
> tested previously, but current technology could provide
> a reasonable likelihood of more accurate and probative
> results, (b) the biological material has been retained
> under circumstances likely to safeguard the integrity of
> its original physical composition, and (c) such testing
> may produce noncumulative, exculpatory evidence rel-
> evant to the claim that the person was wrongfully con-
> victed or sentenced.[16]

In *Buckman*, we elaborated on the last prong of § 29-4120(5)
and clarified that the threshold to satisfy it was rather low.
We stated:

> Exculpatory evidence is defined as evidence favorable
> to the person in custody and material to the issue of the
> guilt of the person in custody. . . . [T]his requirement is

---

[13] *Id.* at 514, 675 N.W.2d at 380.

[14] § 29-4120(5).

[15] See, e.g., *State v. Betancourt-Garcia, supra* note 7; *State v. Marrs*, 295
Neb. 399, 888 N.W.2d 721 (2016); *State v. Young*, 287 Neb. 749, 844
N.W.2d 304 (2014); *State v. McDonald*, 269 Neb. 604, 694 N.W.2d 204
(2005).

[16] § 29-4120(5).

relatively undemanding for a movant seeking DNA testing and will generally preclude testing only where the evidence at issue would have no bearing on the guilt or culpability of the movant.[17]

But a more rigorous standard applies *after* testing has been ordered. In *Buckman*,[18] we also set forth the procedure applicable after a court orders DNA testing. We stated:

Once DNA testing is conducted, and results are obtained, the question is whether the evidence obtained exonerates or exculpates the movant. Based on the test results, the movant may obtain relief in one of two ways, each of which requires a different quantum of proof. As previously noted, when the test results exonerate or exculpate the movant, the court may "vacate and set aside the judgment and release the person from custody." . . . However, if the court does not vacate and set aside the judgment, the movant may file a motion for new trial based upon "newly discovered exculpatory DNA or similar forensic testing obtained under the DNA Testing Act."[19]

We summarized the proof necessary for each potential remedy:

[T]he court may vacate and set aside the judgment in circumstances where the DNA testing results are either completely exonerative or highly exculpatory—when the results, when considered with the evidence of the case which resulted in the underlying judgment, show a complete lack of evidence to establish an essential element of the crime charged. . . . This requires a finding that guilt cannot be sustained because the evidence is doubtful in character and completely lacking in probative value. . . . [I]n other circumstances where the evidence

---

[17] *State v. Buckman, supra* note 5, 267 Neb. at 515, 675 N.W.2d at 381 (citation omitted).

[18] *State v. Buckman, supra* note 5.

[19] *Id.* at 515, 675 N.W.2d at 381 (citation omitted).

is merely exculpatory, the court may order a new trial if the newly discovered exculpatory DNA evidence is of such a nature that if it had been offered and admitted at the former trial, it probably would have produced a substantially different result.[20]

As *Buckman* demonstrates, the showing that must be made to obtain DNA testing presents a relatively low threshold. After testing, however, a much higher showing is required to either set aside a judgment or require a new trial.

Here, the district court was presented with the first step in the framework—whether to require testing. It denied testing on the basis that Myers failed to meet the "may produce noncumulative, exculpatory evidence" requirement of § 29-4120(5)(c). But in making its determination, the court discussed a more onerous standard governing relief which might be available after testing has been performed.

The court's order shows that it imported the legal standard for determining whether to vacate or set aside a conviction. It quoted, with emphasis, when a motion to vacate and set aside the judgment under § 29-4123(2) may be granted. It also quoted language from *Buckman*, highlighting that vacating or setting aside a judgment was intended "to apply to those cases in which DNA test results 'conclusively establish the guilt or innocence of a criminal defendant'"[21] and would be proper "only where the results of DNA testing either completely exonerated the movant or were highly exculpatory."[22] Finally, the court found that "regardless of whether [Myers'] DNA was excluded or someone else's DNA could be found on this evidence, such DNA results would not 'show a complete lack of evidence to establish an essential element of the crime charged' when you consider the totality of the evidence."

---

[20] *Id.* at 518, 675 N.W.2d at 383 (citations omitted).

[21] *Id.* at 516, 675 N.W.2d at 382.

[22] *Id.* at 516-17, 675 N.W.2d at 382.

On appeal, we are tasked with determining whether the district court abused its discretion in denying Myers' motion for DNA testing. But we cannot do so, because the court mingled standards applicable to § 29-4123(2) and (3) into its analysis under § 29-4120(5). Where it should have addressed only the first part of the statutory framework, its decision can be read to instead delve into the questions that apply in the latter part of the framework. Here, the question before the court was whether to allow testing.

Because the court's order fails to make clear that its denial of DNA testing was based solely on § 29-4120(5), we must remand the cause to the district court for a determination under that section, based upon the existing record. On remand, the court shall determine whether the requirements of § 29-4120(5) have been met, including whether DNA testing of the items requested may produce noncumulative evidence which is favorable to Myers and material to the issue of his guilt.

### APPOINTMENT OF COUNSEL

Myers also assigns error to the district court's denial of his motion for the appointment of counsel. A court shall appoint counsel for an indigent person upon a showing that DNA testing may be relevant to the person's claim of wrongful conviction.[23] Because we are remanding the cause to the district court to consider whether Myers' motion for DNA testing should be granted under the proper standard, we also remand the cause for a determination as to whether he made the requisite showing to require the appointment of counsel.

### ACCESS TO BIOLOGICAL MATERIAL

Myers also contends that the Omaha Police Department did not disclose to the defense that it secured a sexual assault examination kit and collected a vaginal vault sample from the

---

[23] § 29-4122.

victim. He argues that such action violated his right to due process and equal protection of law. This is not part of the DNA Testing Act framework.

The DNA Testing Act is a limited remedy providing inmates an opportunity to obtain DNA testing in order to establish innocence after a conviction.[24] We have previously stated, although in dicta, that a constitutional challenge to the destruction of evidence is outside the purview of the DNA Testing Act.[25] We conclude that whether the prosecution improperly withheld evidence is not properly presented in a motion for DNA testing. Upon remand, the district court need not consider this argument further.

## CONCLUSION

Because the district court applied principles governing relief which might be available after testing when it should have limited its consideration to whether it was required to order testing, we must reverse the order and remand the cause for reconsideration of the motions under the correct portion of the governing framework. We likewise reverse the denial of counsel and remand the cause for a determination as to whether Myers made the requisite showing to be entitled to the appointment of counsel.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.

FREUDENBERG, J., not participating.

---

[24] *State v. Betancourt-Garcia, supra* note 7.

[25] See *id.*