Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/08/2020 08:17 AM CDT

STATE OF NEBRASKA, APPELLEE, V.
JAY D. AMAYA, APPELLANT.
___ N.W.2d ___

Filed February 14, 2020.    No. S-19-189.

1. **Motions to Dismiss: DNA Testing: Appeal and Error.** A motion to dismiss a proceeding under the DNA Testing Act after testing has been completed is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed.

2. **DNA Testing: Appeal and Error.** An appellate court will uphold a trial court's findings of fact related to a motion for DNA testing unless such findings are clearly erroneous.

3. **Statutes: Appeal and Error.** Statutory interpretation presents a question of law, which an appellate court reviews independently of the lower court's determination.

4. **DNA Testing: Pleas.** The DNA Testing Act does not exclude persons who were convicted and sentenced pursuant to pleas.

5. **DNA Testing.** Neb. Rev. Stat. § 29-4123(2) (Reissue 2016) of the DNA Testing Act allows a court to vacate the judgment and release the person from custody only when the DNA test results "exonerate or exculpate the person."

6. \_\_\_\_. When DNA test results are either inculpatory, inconclusive, or immaterial to the issue of the person's guilt, the results will not entitle the person to relief under the DNA Testing Act.

7. **DNA Testing: Motions to Vacate: Motions for New Trial.** The remedies available under the DNA Testing Act are limited to those set out in Neb. Rev. Stat. § 29-4123(2) and (3) (Reissue 2016) and include, respectively, either vacating and setting aside the judgment and releasing the defendant from custody or seeking a new trial.

8. **Statutes.** Basic principles of statutory interpretation require a court to give statutory language its plain and ordinary meaning.

9. **Statutes: Legislature: Intent.** In discerning the meaning of a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered it in its plain, ordinary, and popular sense.

10. **Statutes: Intent.** When interpreting a statute, a court must give effect, if possible, to all the several parts of a statute and no sentence, clause, or word should be rejected as meaningless or superfluous if it can be avoided.

11. **DNA Testing: Sentences: Motions for New Trial.** Resentencing, absent a successful motion for new trial under Neb. Rev. Stat. § 29-4123(3) (Reissue 2016), is not a form of relief available under the DNA Testing Act.

12. **DNA Testing: Pleas.** The relief of withdrawing a guilty or no contest plea is not an available remedy under the DNA Testing Act.

Appeal from the District Court for Lincoln County: Michael E. Piccolo, Judge. Affirmed.

Robert W. Kortus, of Nebraska Commission on Public Advocacy, for appellant.

Douglas J. Peterson, Attorney General, and Stacy M. Foust for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, and Papik, JJ.

Stacy, J.

In 1999, Jay D. Amaya pled no contest and was convicted of first degree murder, use of a deadly weapon to commit a felony, and first degree sexual assault. In 2017, he moved for DNA testing under the DNA Testing Act,[1] and the district court ultimately ordered testing of four items of evidence. After the test results were received, the State moved to dismiss the proceeding. The district court granted the motion to dismiss, and Amaya appeals. We affirm.

---

[1] Neb. Rev. Stat. §§ 29-4116 to 29-4125 (Reissue 2016).

## I. FACTS

### 1. Background

In 1998, Sheri Fhuere was sexually assaulted and killed in her home in North Platte, Nebraska. Both Amaya and Michael E. Long were arrested and charged with the crimes. The following facts are taken from our 2008 opinion addressing Amaya's first motion for postconviction relief.[2]

> When police arrived at Fhuere's home on July 16, 1998, they found Long attempting to resuscitate her. Fhuere had been beaten and sexually assaulted, and her throat had been slashed. There was a severe bite mark on her left thigh. Fhuere was pronounced dead at the scene, and a pathologist later determined that she died as the result of either the slash wound or the beating.

> Long was interviewed several times over the next hours and eventually gave a written statement to police dated July 16, 1998. Although there were inconsistencies in his story, he generally told officers that he and Amaya beat Fhuere and that Amaya slashed her throat. Long also told the officers where to find the knife that Amaya used, and he stated that Amaya had bitten Fhuere during the assault. A forensic dentist later matched the bite mark to a dental impression of Amaya's teeth. DNA testing established the presence of Fhuere's blood on Amaya's shoe. Amaya wrote letters confessing to the crimes.

> Both Long and Amaya were charged with first degree murder. Amaya was also charged with use of a deadly weapon to commit a felony and first degree sexual assault. Long entered into a plea agreement with the State. In exchange for his testimony against Amaya, the charges against Long were reduced to aiding and abetting second degree murder and aiding and abetting first degree

---

[2] *State v. Amaya*, 276 Neb. 818, 758 N.W.2d 22 (2008).

sexual assault. Long was sentenced to 25 years' to life imprisonment on the murder conviction and 5 to 10 years' imprisonment on the sexual assault conviction.

Amaya's appointed trial counsel deposed Long after Long had entered into the plea agreement but before Amaya had entered his no contest pleas. The deposition revealed that Long had significant drug, alcohol, and mental health issues that began in his early teens and continued at the time of the deposition. It also revealed that he had given several statements about Fhuere's death to the police and that, in general, each succeeding statement tended to mitigate his culpability and exaggerate Amaya's. Long stated during this deposition that the written statement he had given to police on July 16, 1998, was truthful. He also stated, however, that he was extremely intoxicated the night of the murder and that some of the details in the statement were not correct. He admitted that he had also told officers that evening that he had blacked out and could not remember everything that had happened.

After Long had been deposed, and after being fully advised of his rights, Amaya entered the no contest pleas in exchange for the State's agreement not to seek the death penalty or introduce evidence of aggravating circumstances. Prior to entering the pleas, Amaya wrote a letter to his attorneys expressing his desire to avoid the death penalty. The pleas were entered on October 19, 1999, and Amaya was sentenced on November 19.[3]

Amaya was sentenced to life imprisonment on the first degree murder conviction and to consecutive prison sentences of 10 to 20 years on the use of a deadly weapon conviction and 20 to 40 years on the first degree sexual assault conviction. He did not file a direct appeal.

---

[3] *Id.* at 819-20, 758 N.W.2d at 25-26.

## 2. Motion for DNA Testing

In September 2017, Amaya filed a pro se motion asking the court to order DNA testing of numerous items of evidence under the DNA Testing Act and seeking the appointment of counsel. The court appointed counsel, who revised the pro se motion and successfully moved the court to authorize testing on swabs taken from (1) the bite mark on Fhuere's thigh, (2) the handle of the knife allegedly used to slash Fhuere's throat, (3) the mouth area of the beer bottle in which the knife was allegedly stored for disposal, and (4) the mouth area of a beer bottle found on the front porch of Fhuere's home.

All of the DNA test results generated a DNA profile consistent with a mixture of two individuals. Results from the bite mark showed the major DNA profile matched Amaya, and therefore, Amaya was not excluded as the major contributor. The probability of an unrelated individual matching the major DNA profile was 1 in 1.55 octillion. The minor profile from the bite mark was consistent with Fhuere. Results from the knife handle and from the mouth of the beer bottle in which the knife was stored showed the major DNA profile matched Fhuere, and results concerning the minor contributor were inconclusive due to limited information. Results from the mouth of the beer bottle found on the porch showed the major DNA profile matched Long, and results concerning the minor contributor were inconclusive due to limited information.

After receiving the DNA test results, the State moved to dismiss the proceeding,[4] alleging the results neither exonerated nor exculpated Amaya. At the evidentiary hearing on the motion to dismiss, Amaya claimed the test results entitled him to relief, and he asked the court to either (1) vacate his convictions and release him from custody, (2) allow him to withdraw his no contest pleas and proceed to trial, or (3) resentence him on the same convictions.

---

[4] See, *State v. Poe*, 271 Neb. 858, 717 N.W.2d 463 (2006); *State v. Bronson*, 267 Neb. 103, 672 N.W.2d 244 (2003).

The district court granted the State's motion to dismiss. It found that the DNA test results did not exonerate or exculpate Amaya and that he was not entitled to release or to a new trial. The court did not directly address Amaya's arguments that he should be resentenced or allowed to withdraw his pleas. Amaya filed this timely appeal.

## II. ASSIGNMENT OF ERROR

Amaya assigns, restated, that the district court erred in granting the State's motion to dismiss.

## III. STANDARD OF REVIEW

[1] A motion to dismiss a proceeding under the DNA Testing Act after testing has been completed is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed.[5]

[2] An appellate court will uphold a trial court's findings of fact related to a motion for DNA testing unless such findings are clearly erroneous.[6]

[3] Statutory interpretation presents a question of law, which an appellate court reviews independently of the lower court's determination.[7]

## IV. ANALYSIS

In arguing it was error for the district court to grant the State's motion to dismiss, Amaya presents three alternative theories. First, he argues the DNA test results completely exonerated and exculpated him so his convictions should have been vacated and he should have been released. Alternatively, Amaya argues he should have been allowed to withdraw his pleas, because if he had known the DNA test results, he would not have entered his pleas and would have insisted on going to trial. Finally, he argues that even if the DNA test results

---

[5] See *Poe, supra* note 4.

[6] *State v. Ildefonso*, 304 Neb. 711, 936 N.W.2d 348 (2019).

[7] *State v. Lovvorn*, 303 Neb. 844, 932 N.W.2d 64 (2019).

did not support vacating his convictions or allowing him to withdraw his pleas, the test results entitle him to the relief of resentencing.

Before addressing Amaya's arguments, we review the legal framework of the DNA Testing Act.

### 1. DNA Testing Act

[4] Section 29-4120(1) of the act provides that a person "in custody pursuant to the judgment of a court may, at any time after conviction," file a motion requesting DNA testing. This court has previously held the DNA Testing Act does not exclude defendants such as Amaya who were convicted based on a plea.[8]

Section 29-4120 sets out what a defendant must do to obtain DNA testing. We have explained:

> "The initial step toward obtaining relief under the DNA Testing Act is for a person in custody to file a motion requesting forensic DNA testing of biological material. . . . Forensic DNA testing is available for any biological material that is related to the investigation or prosecution that resulted in the judgment; is in the actual or constructive possession of the state, or others likely to safeguard the integrity of the biological material; and either was not previously subjected to DNA testing or can be retested with more accurate current techniques."[9]

If these threshold criteria are met, and if the court finds that "testing may produce noncumulative, exculpatory evidence relevant to the claim that the person was wrongfully convicted or sentenced,"[10] then under § 29-4120(5) the court "shall order DNA testing." But a court is not required to order postconviction DNA testing if such testing would not produce exculpatory

---

[8] See *State v. Winslow*, 274 Neb. 427, 740 N.W.2d 794 (2007).

[9] *State v. Myers*, 301 Neb. 756, 762, 919 N.W.2d 893, 897 (2018), quoting *State v. Buckman*, 267 Neb. 505, 675 N.W.2d 372 (2004). See § 29-4120(1).

[10] § 29-4120(5).

evidence.[11] The act defines "exculpatory evidence" as "evidence which is favorable to the person in custody and material to the issue of the guilt of the person."[12]

In this case, the court ordered DNA testing on four items of evidence and no party contends it was error to order the testing. We therefore move on to the procedure to be followed once the DNA test results are complete.

Under § 29-4123(2), the test results must be disclosed to the county attorney and to the person who requested the testing and his or her attorney. After receiving the test results, either party may request a hearing on whether the results "exonerate or exculpate the person."[13] Following such a hearing, the court may, on its own or on the motion of either party, "vacate and set aside the judgment and release the person from custody based upon final testing results exonerating or exculpating the person."[14] If the court does not vacate and set aside the conviction, then § 29-4123(3) provides that "any party may file a motion for a new trial under sections 29-2101 to 29-2103."

As for when a court may vacate a conviction and release the person under § 29-4123(2), and when it may order a new trial under § 29-4123(3), we have explained:

"[T]he court may vacate and set aside the judgment in circumstances where the DNA testing results are either completely exonerative or highly exculpatory—when the results, when considered with the evidence of the case which resulted in the underlying judgment, show a complete lack of evidence to establish an essential element of the crime charged. . . . This requires a finding that guilt cannot be sustained because the evidence is doubtful in

---

[11] *Ildefonso, supra* note 6.

[12] § 29-4119.

[13] § 29-4123(2).

[14] *Id.*

character and completely lacking in probative value. . . . [I]n other circumstances where the evidence is merely exculpatory, the court may order a new trial if the newly discovered exculpatory DNA evidence is of such a nature that if it had been offered and admitted at the former trial, it probably would have produced a substantially different result."[15]

Here, after the DNA test results were obtained, Amaya did not move for a hearing.[16] Instead, the State sought to dismiss the DNA testing proceeding, arguing the results of the DNA testing did not exonerate or exculpate Amaya and he was not entitled to relief. At the hearing on that motion, Amaya orally argued that the DNA test results were exculpatory and his convictions should be vacated or, alternatively, that the results entitled him to either withdraw his pleas or be resentenced. The court granted the State's motion to dismiss. We review its factual findings for clear error[17] and its decision for an abuse of discretion.[18]

### 2. AMAYA'S ARGUMENTS

Amaya argues, summarized, that his plea-based convictions were largely based on Long's anticipated testimony against him. He contends the DNA test results "provide powerful scientific evidence demonstrating that Long was lying."[19] He focuses primarily on the test results from the mouth of the beer bottle found on the porch, as well as on the test results from the knife and the beer bottle in which the knife was disposed.

---

[15] *Myers, supra* note 9 at 764-65, 919 N.W.2d at 898, quoting *Buckman, supra* note 9.

[16] See § 29-4123(2).

[17] See *Ildefonso, supra* note 6.

[18] See *Poe, supra* note 4.

[19] Brief for appellant at 18.

### (a) Beer Bottle From Porch

Amaya argues the test results from the beer bottle on the porch "conclusively show that Long lied about the consumption of alcohol at the Fhuere residence."[20] His logic in this regard is not obvious, so we provide additional facts.

Amaya explains that in a 1999 deposition, Long testified that he was drinking beer on the night of the crime and that he brought the beer with him from his own house. According to Amaya, the evidence inventory completed by police shows that the beer bottle that was found to have Long's DNA on the mouth area was the same brand, and from the same batch, as 54 other bottles of beer found at Fhuere's residence. Amaya thus suggests the DNA test results show that Long did not bring that beer bottle from his own home and "firmly establish that Long was lying."[21] Amaya posits that if Long lied about bringing the beer, it "casts a cloud of suspicion"[22] on the credibility of his other statements concerning the crimes.

With respect to this test result, the district court found:

> The major DNA profile from this sample matches the co-Defendant, . . . Long. The results concerning the minor contributor [were] inconclusive, due to limited information. However, this information, when considered with the other evidence of the case, is doubtful in character and lacks, in this Court's opinion, tangible probative value.

The court's findings are fully supported by the record and are not clearly erroneous.

### (b) Knife and Beer Bottle

Amaya argues the test results on the handle of the knife and the mouth of the beer bottle in which it was found "fail

---

[20] *Id*. at 25.

[21] *Id*. at 18.

[22] *Id*. at 31.

to support any claims Long made about Amaya handling the knife during and after the murder."[23] He points out the test results showed Fhuere was the major contributor of the DNA found on the knife handle and on the mouth of the beer bottle, and he suggests this "directly contradicts the narrative of Long which has Amaya grasping that knife to cut Fhuere's throat, handling that knife by placing it in a beer bottle, and throwing that beer bottle out of a car near 7th and Adams Streets in North Platte."[24]

With respect to these test results, the district court found:

> The material tested from the black-handled knife [and] the mouth area of the beer bottle found . . . in the area of 7th and Adams streets in North Platte conclude[s] that the major DNA profile from each of these specimens matches [Fhuere]. No other minor DNA contributors were identified, "due to limited information."

The court's factual findings are fully supported by the record and are not clearly erroneous.

### 3. Results Did Not Exonerate Amaya

Amaya contends that the DNA testing on the beer bottles and the knife handle discredited Long's veracity and that the court should have vacated his convictions and released him from custody. We disagree.

[5] Section 29-4123(2) allows a court to vacate the judgment and release the person from custody only when the DNA test results "exonerate or exculpate the person." The district court did not abuse its discretion in finding that threshold was not met here.

First, it is questionable whether the DNA test results implicate Long's veracity at all. It stretches logic to suggest the test results from the beer bottle found on the porch prove that Long lied about bringing his own beer that evening. And

---

[23] *Id.* at 25.

[24] *Id*. at 19.

contrary to Amaya's contention, the absence of his DNA on the knife or the beer bottle in which it was disposed does not "directly contradict[]" Long's assertions that Amaya slashed Fhuere's throat and disposed of the knife in the beer bottle, particularly where the results were inconclusive as to the minor contributor.

We have recognized that if DNA testing does not detect the presence of a prisoner's DNA on an item of evidence, such a result is at best inconclusive, especially when there is other credible evidence tying the defendant to the crime.[25] Here, there was plenty of other credible evidence pointing to Amaya's involvement in the crimes.

The DNA test results of the bite mark on the victim's thigh corroborated the forensic dentist's opinion matching the bite mark to Amaya, and also corroborated Long's testimony that Amaya had bitten Fhuere during the assault. Earlier DNA testing showed Fhuere's blood was on Amaya's shoe. And perhaps the most credible evidence tying Amaya to the crimes were letters he wrote from jail confessing to involvement in Fhuere's murder.

Moreover, even if the test results could be understood to call Long's credibility into question, the record shows that, at the time he entered his pleas, Amaya already had reason to question Long's credibility. He knew Long had given police inconsistent accounts of what happened the evening of the crimes, and his attorney had deposed Long and acquired additional information relevant to Long's credibility. Because significant questions as to Long's veracity and credibility already existed at the time Amaya chose to enter his pleas, we do not see how the DNA test results revealed anything new.

[6] When DNA test results are either inculpatory, inconclusive, or immaterial to the issue of a person's guilt, the results will not entitle the person to relief under the DNA Testing

---

[25] See *Ildefonso, supra* note 6.

Act. On this record, the DNA test result on the bite mark was inculpatory and unfavorable to Amaya and the remaining testing was either inconclusive or immaterial to the issue of his guilt. The district court did not abuse its discretion in concluding Amaya was not entitled to have his convictions vacated, because the DNA test results were neither exonerative nor exculpatory.[26]

### 4. Resentencing Is Not Remedy Under DNA Testing Act

Alternatively, Amaya asks us to remand this matter to the district court with instructions to "consider whether Amaya was wrongfully sentenced."[27] He argues the DNA test results "establish that Long had substantially less credibility than was apparent at the time of sentencing,"[28] and he suggests that if the sentencing court had been aware of the test results, "different and more favorable sentences would have been given."[29] Because we conclude the DNA Testing Act does not authorize the relief of resentencing, we reject Amaya's argument without addressing his reasoning.

[7] As noted, there are two remedies available under the DNA Testing Act. Those remedies are set out in § 29-4123(2) and (3), and they include, respectively, either vacating and setting aside the judgment and releasing the defendant from custody or requesting a new trial. As we explain more fully below, resentencing is not among the statutory remedies enacted by the Legislature, and we decline Amaya's invitation to judicially expand the act to include such relief.

Amaya asks us to find that resentencing must be a remedy under the act, because § 29-4120(5)(c) allows a court to order DNA testing if it *"may produce noncumulative, exculpatory*

---

[26] See § 29-4123(2).

[27] Brief for appellant at 17.

[28] *Id*. at 20.

[29] *Id*. at 21.

evidence relevant to the claim that the person was wrongfully convicted or sentenced." This is the only time the DNA Testing Act mentions "sentencing," and it is significant that the reference is contained only in the section of the act governing when testing can be ordered, and not in the later section governing available relief.

[8-10] Basic principles of statutory interpretation require a court to give statutory language its plain and ordinary meaning.[30] In discerning the meaning of a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense.[31] Additionally, when interpreting a statute, a court must give effect, if possible, to all the several parts of a statute and no sentence, clause, or word should be rejected as meaningless or superfluous if it can be avoided.[32]

We have recognized that the DNA Testing Act imposes a relatively low threshold for those seeking to obtain testing of biological material, but once the testing is complete, the act imposes a much more rigorous standard for obtaining relief.[33] It is a given that, under such a scheme, far more people will be entitled to ask for DNA testing under the act than will ultimately be entitled to relief under the act.

Giving the statutory language its plain and ordinary meaning, we find that the phrase in § 29-4120(5)(c) referring to a "claim that the person was wrongfully convicted or sentenced" describes the type of claim that may entitle a movant to request DNA testing when the other statutory criteria are met, but the phrase has no impact on the type of relief the movant is ultimately entitled to under § 29-4123 of the act.

---

[30] *Lovvorn, supra* note 7.

[31] See *Bridgeport Ethanol v. Nebraska Dept. of Rev.*, 284 Neb. 291, 818 N.W.2d 600 (2012).

[32] See *State v. Phillips*, 302 Neb. 686, 924 N.W.2d 699 (2019).

[33] See, § 29-4120; *Myers, supra* note 9.

[11] As stated, the DNA Testing Act authorizes just two forms of relief: (1) complete exoneration and vacation of judgment and release from custody or (2) the opportunity to file a motion for new trial.[34] Resentencing, absent a successful motion for new trial under § 29-4123(3), is not a form of relief available under the act. The district court did not err in not considering resentencing in this proceeding.

## 5. Withdrawal of Plea Not Remedy Under DNA Testing Act

Finally, Amaya argues that if he had known about the DNA test results before he entered his pleas, he would have insisted on going to trial. His argument is, again, generally premised on an assertion that the DNA test results negated Long's credibility—an assertion we already have rejected.

[12] But more importantly, the relief of withdrawing a guilty or no contest plea is not an available remedy under the DNA Testing Act. As already explained, the act authorizes a district court to "vacate and set aside the judgment and release the person from custody based upon final testing results exonerating or exculpating the person."[35] And if that relief is not granted, the act provides that "any party may file a motion for a new trial under sections 29-2101 to 29-2103."[36] The plain language of the act does not authorize a court to find that, based on DNA test results, a defendant's plea-based conviction can be set aside, the plea withdrawn, and a new trial held.

For the sake of completeness, we note that Amaya's counsel insisted during oral argument that his client's request to withdraw his pleas should not be construed as a motion for new trial under § 29-4123(3). This is consistent with the position he took before the district court on the motion to dismiss. We thus express no opinion on whether a person whose conviction

---

[34] § 29-4123.

[35] § 29-4123(2).

[36] § 29-4123(3).

is plea based can, after DNA testing results are obtained, move for a new trial under § 29-4123(3) and Neb. Rev. Stat. §§ 29-2101 to 29-2103 (Reissue 2016).[37]

## V. CONCLUSION

The district court's factual findings were not clearly erroneous, and it did not abuse its discretion in granting the State's motion to dismiss. The judgment of the district court is affirmed.

AFFIRMED.

FREUDENBERG, J., not participating.

---

[37] Compare *State v. Daly*, 227 Neb. 633, 418 N.W.2d 767 (1988) (holding acceptance of guilty plea constitutes verdict of conviction under statute regarding new trials), and *State v. Kluge*, 198 Neb. 115, 251 N.W.2d 737 (1977) (motion for new trial on ground of newly discovered evidence not appropriate where defendant enters plea and thus waives all defenses to crime charged), *disapproved on other grounds, State v. Minshall*, 227 Neb. 210, 416 N.W.2d 585 (1987).