Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/15/2022 12:07 AM CDT

State of Nebraska, appellee, v.
Herman D. Buckman, appellant.
___ N.W.2d ___

Filed April 1, 2022.    No. S-21-399.

1. **Motions to Dismiss: DNA Testing: Appeal and Error.** A motion to dismiss a proceeding under the DNA Testing Act after testing has been completed is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed.
2. **DNA Testing: Appeal and Error.** An appellate court will uphold a trial court's findings of fact related to a motion for DNA testing unless such findings are clearly erroneous.
3. **DNA Testing.** Postconviction DNA evidence that does not falsify or discredit evidence that was necessary to prove an essential element of the crime does not exonerate the movant.
4. ____. When DNA test results are either inculpatory, inconclusive, or immaterial to the issue of the person's guilt, the results will not entitle the person to relief under the DNA Testing Act.
5. ____. If DNA testing does not detect the presence of a prisoner's DNA on an item of evidence, such result is at best inconclusive, especially when there is other credible evidence tying the defendant to the crime.

Appeal from the District Court for Lancaster County: Susan I. Strong, Judge. Affirmed.

Robert W. Kortus, of Nebraska Commission on Public Advocacy, for appellant.

Douglas J. Peterson, Attorney General, and Erin E. Tangeman for appellee.

Miller-Lerman, Cassel, Stacy, Funke, and Papik, JJ.

Cassel, J.

## I. INTRODUCTION

For a second time, Herman D. Buckman obtained testing on evidence under the DNA Testing Act.[1] After receiving results of the testing, the State moved to dismiss the proceeding. The court sustained the motion, and Buckman appeals. Because the test results did not exonerate or exculpate Buckman, we affirm the judgment of the district court.

## II. BACKGROUND

### 1. General History

In 1988, law enforcement found Denise Stawkowski lying across the front seat of her car, dead from two gunshot wounds to her head. The State charged Buckman with first degree murder of Stawkowski and use of a weapon to commit that felony.

According to evidence at trial, Stawkowski sold drugs to a number of individuals, including Buckman and his girlfriend, Goldie Fisher. There was evidence that Buckman felt he had been cheated by Stawkowski on either the quantity or the quality of drugs he had been buying from her.

A few hours before Stawkowski's murder, Buckman and Fisher tried to sell or trade a ".38 Special" gun to Stawkowski's husband in return for drugs. The same caliber gun was used to kill Stawkowski. Evidence at trial established that Buckman often wore slippers in public. Investigators located two brown slippers near Stawkowski's car. One slipper was discovered on the shoulder of the road south of the car's location, and the other was found in a nearby field.

Stawkowski's purse contained roughly $2,000 and three "eight-balls" of cocaine when she was with Fisher at approximately 1 a.m. on February 19, 1988. These items were not found with Stawkowski's body. Later on February 19, Buckman

---

[1] Neb. Rev. Stat. §§ 29-4116 to 29-4125 (Reissue 2016).

and Fisher spent large amounts of cash. A day earlier, they were trying to sell clothing in an effort to get money to pay Fisher's babysitter. When Buckman was arrested, he had $656 in cash in his possession and the clothing items he and Fisher had tried to sell were still in his car.

Hours before discovery of the murder, a witness picked up Fisher on a road near where Stawkowski's body was found. Other evidence placed Fisher with Buckman in the hours before and after the murder. A cellmate of Buckman testified that Buckman bragged of killing Stawkowski in Fisher's presence and using the money he stole from Stawkowski to pay debts.

As part of the original investigation of the murder, Dr. Reena Roy, a forensic serologist with the Nebraska State Patrol, tested bloodstains found on various items. Roy concluded that small amounts of blood on a jacket, a sweater, and jeans that Buckman was wearing at the time of arrest, on the brown slippers located in the area where Stawkowski's car was found, and on the steering wheel cover and floormats of Buckman's car contained blood group A and adenylate kinase enzyme (AK) of 2-1. That blood combination was consistent with Stawkowski's genetic markers, but it excluded approximately 96.5 percent of the Caucasian and 99.5 percent of the African-American populations.

According to evidence at trial, Buckman smoked Kool cigarettes and opened his cigarette packages from the bottom. A Kool cigarette butt and a Camel cigarette butt were found on the rear floorboard in Stawkowski's car. A package of Kool cigarettes, opened from the bottom, was located in a field near the car. Dr. Moses Schanfield tested the cigarette butts and concluded that Buckman could not be excluded as the person who smoked them. Schanfield stated that only 0.7 percent of the Caucasian population and 4.8 percent of the African-American population could have been the donor of the saliva found on the Kool cigarette butt and that Buckman fell within that 4.8 percent.

A jury convicted Buckman of first degree murder and use of a deadly weapon to commit a felony.[2] The trial court imposed sentences, including life in prison for the murder conviction.

On direct appeal, Buckman challenged the sufficiency of the evidence, in addition to several other issues.[3] We rejected all of the assigned errors and stated that a myriad of detailed evidence supported the convictions.[4]

In 1998, Buckman moved for postconviction relief. The district court denied the motion without an evidentiary hearing.[5] We affirmed, finding no merit to Buckman's claims of ineffective assistance of trial counsel.

Buckman subsequently sought testing of bloodstains and cigarette butts under the DNA Testing Act. The district court ordered testing, which the University of Nebraska Medical Center (UNMC) performed. UNMC tested Buckman's jacket, sweater, and jeans, as well as cuttings from his jacket, for hemoglobin, but did not detect any blood. DNA testing on areas of Buckman's jacket, sweater, and cap did not detect a DNA profile. UNMC tested cuttings from each slipper: one was negative for hemoglobin, and one was a weak positive for hemoglobin, but no DNA profile was found on the cuttings. UNMC attempted to extract DNA from the cigarette butts, and the results were inconclusive.

The district court denied Buckman's motion to vacate and set aside his convictions after concluding that none of the evidence from UNMC's testing exonerated Buckman, exculpated him, or proved Buckman's innocence. The court denied Buckman's motion for new trial after concluding that there was no reasonable possibility UNMC's testing results, if

---

[2] See *State v. Buckman*, 237 Neb. 936, 468 N.W.2d 589 (1991).

[3] See *id.*

[4] See *id.*

[5] See *State v. Buckman*, 259 Neb. 924, 613 N.W.2d 463 (2000).

presented at trial, would have produced a different result. We affirmed.[6]

### 2. Instant Proceeding for DNA Testing

In 2016, Buckman filed a motion requesting DNA testing on Stawkowski's panties. After the State filed an inventory, which included items that were unavailable at the time of Buckman's previous proceeding for DNA testing, Buckman added a request that blood on the steering wheel cover and floormats of his car be tested. The court sustained Buckman's request for DNA testing on those items and appointed counsel to represent him.

### (a) Evidence Relating to Items Tested

The items tested—panties, steering wheel cover, and floormats—had been held in a semi-trailer truck. The trailer lacked temperature or humidity control. Mellissa Helligso, a forensic DNA analyst, performed DNA testing on the items. When asked if she found any evidence of heat damage with respect to the steering wheel cover or the floormats, Helligso answered that she was unable to tell the difference between degradation and low-level DNA. But extreme heat or cold did not affect her ability to test the panties. If there were concerns of heat, light, or moisture, the concerns would have exhibited themselves on the panties, and they did not.

As to the items, we set forth background information and evidence from trial and then evidence concerning Helligso's testing.

### (i) Steering Wheel Cover and Floormats

Prior to trial, the steering wheel cover and floormats were submitted to Roy for testing. She scraped the cover by using a scalpel to take blood off of four different areas and tested for blood group and AK. She also tested blood from both front floormats. The results were blood group A and AK 2-1.

---

[6] See State v. Buckman, 267 Neb. 505, 675 N.W.2d 372 (2004).

Helligso had concerns that the amount of DNA was so low that it was undetected with her quantification assay. She did not detect any blood on the steering wheel cover or the floor-mats. Helligso testified that the fact she did not detect any blood did not mean that there was not blood at the time of Roy's initial testing.

### (ii) Panties

During opening statements, counsel for both parties made reference to Stawkowski's having engaged in sexual inter-course with someone other than her husband. The prosecutor stated:

> You'll also hear evidence during the autopsy Dr. [Daniel J.] Till found that there was semen in . . . Stawkowski's vagina. The evidence will be that she and her husband had not had sexual intercourse that day. . . . There's no indication that she had sexual intercourse with anyone else. There's no indication that she had been sexually assaulted. When her body was found, her clothes were not in disarray. She was fully clothed. Again, there's no indication that this has anything to do with this case, but you will hear that evidence.

Defense counsel stated that Stawkowski "had sex" with some-body other than her husband and that "[t]hat's in dispute . . . and that's important."

Daniel J. Till, M.D., a pathologist, testified at trial that he performed a forensic autopsy on Stawkowski on February 19, 1988. He testified that her body was clothed when found. Till opined that her death occurred sometime in the early morning hours of February 19, with a timeframe of 1 to 3:30 a.m., and that sperm found in Stawkowski's vagina could have been there within 8 hours of her death.

Schanfield tested various items for immunoglobulin allo-types, ABO blood group substance, and Lewis blood group substance. Based on his results of the panties extract and

the vaginal swab extract, he was not able to draw any conclusions as to the allotypes and other genetic markers of the person responsible for the semen found in the panties and on the vaginal swab. He did not find anything that he would classify as a foreign marker; everything he found was consistent with Stawkowski.

Roy detected semen on the panties, jeans, and vaginal swab. She could not perform "DNA fingerprinting testing," because there was not "enough high-molecular-weight DNA from the semen sample." Roy performed testing in an effort to determine any blood group substances in the semen and found blood group substance A and H. Based on the results, Roy could not exclude Buckman as the semen donor. He fell within the 35 percent of the male population who could be the possible semen donor. Nor could Roy exclude Eric Beckwith, an individual arrested along with Buckman and Fisher. Through the testing, Roy was able to exclude Stawkowski's husband and two acquaintances of Stawkowski as the semen donor. She estimated that the semen found on the vaginal swab could not have been there longer than 12 hours.

The State made no mention of semen in its initial closing argument. But the defense said that Till "also talks about an interesting point: that he found spermatozoa that was present in the findings from . . . Stawkowski, and he put a time frame on that of about eight hours prior to her death." Then, in the State's rebuttal, the prosecutor stated:

And there's absolutely no evidence whatsoever linking . . . Beckwith to this crime, period. There is evidence that he may have been responsible for the semen, but so could 35 percent of the black population and the white population. And so could [Buckman]. He's also in that percentage of the population that could have been responsible for that semen. And somebody that's cold enough to rob somebody and take a gun and shoot 'em twice in the head, are they cold enough to do something else, a last insult, a sexual assault? It's certainly possible. I'm not suggesting

to you that that happened, but it certainly could have. We don't know. But that's not one of the mysteries of the case that we have to solve either.

In response to the motion for DNA testing, Helligso tested the panties and generated a profile of the sperm donor. Helligso did not have a concern about the level of quantity of the DNA present, and she was able to exclude Buckman as the major contributor of the DNA tested.

### (b) State's Motion to Dismiss

After receiving the test results, the State filed a motion to dismiss Buckman's request for relief under the DNA Testing Act. The State asserted that the steering wheel cover and floor-mats did not satisfy the requirement of § 29-4120(l)(b) that the material was kept under circumstances likely to safeguard the integrity of the biological material's original composition. The State highlighted that those items had been in storage for over 30 years, 10 years of which they were kept in a semi-trailer truck parked outside with no climate control.

### (c) District Court's Decision

The court denied relief under the DNA Testing Act. With regard to the panties, the court stated that the prosecutor at trial admitted that the State did not know whether Buckman had sexual intercourse with Stawkowski and that it was not an essential element of the crimes charged. Although Buckman claimed that the lack of his semen on the panties would be exculpatory, Buckman was not charged with sexual assault. The court reasoned that the exclusion of Buckman as the semen donor did not contradict, falsify, or discredit any evidence presented at trial. The court stated: "The only thing the lack of [Buckman's] semen proves is that the admission of expert testimony regarding the semen at trial was irrelevant. The admission of such irrelevant evidence has been found to be harmless error." The court reasoned that it would be specu-lation to conclude that the absence of Buckman's semen on

the panties would exclude him as the person who murdered Stawkowski and determined that "[a]t best, the lack of evidence is inconclusive and not exculpatory."

As to the steering wheel cover and floormats, the court stated that the testing did not reveal any new or contradictory evidence. The court noted that DNA testing on those items generated only partial DNA profiles that were uninterpretable and could not be compared to any individuals because of the limited information in the partial profiles. The court determined that the absence of blood on these items was not exculpatory, that it did not significantly undermine Roy's testimony at trial, and that it could be explained by the minimal amount of sample originally found on those items and by possible deterioration. The court also recognized Helligso's testimony that just because she was unable to detect blood did not mean it was not present in 1988.

Ultimately, the court concluded that the results obtained did not produce exculpatory evidence or evidence that probably would have produced a substantially different result if it had been presented at Buckman's trial. It sustained the State's motion to dismiss and overruled Buckman's request for relief through further testing or a new trial.

Buckman filed a timely appeal.

### III. ASSIGNMENT OF ERROR

Buckman assigns that the district court erred by sustaining the State's motion to dismiss and denying him relief under the DNA Testing Act.

### IV. STANDARD OF REVIEW

[1] A motion to dismiss a proceeding under the DNA Testing Act after testing has been completed is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed.[7]

---

[7] *State v. Amaya*, 305 Neb. 36, 938 N.W.2d 346 (2020).

[2] An appellate court will uphold a trial court's findings of fact related to a motion for DNA testing unless such findings are clearly erroneous.[8]

## V. ANALYSIS

Here, the district court ordered the DNA testing that Buckman requested, and the State does not argue in its brief that the court erred in doing so. We begin by recalling the process after such testing is ordered and results are received.

### 1. Procedure

In the appeal from Buckman's first proceeding under the DNA Testing Act, we set forth the procedure applicable after a court orders DNA testing.[9] Subsequent amendments to the act have not altered the procedure.[10] After DNA testing results are obtained,

> the question is whether the evidence obtained exonerates or exculpates the movant. Based on the test results, the movant may obtain relief in one of two ways, each of which requires a different quantum of proof. As previously noted, when the test results exonerate or exculpate the movant, the court may "vacate and set aside the judgment and release the person from custody." § 29-4123(2). However, if the court does not vacate and set aside the judgment, the movant may file a motion for new trial based upon "newly discovered exculpatory DNA or similar forensic testing obtained under the DNA Testing Act."[11]

We elaborated on when a court may vacate a conviction and release the person under § 29-4123(2) and when it may order a new trial under § 29-4123(3).[12] We explained:

---

[8] *Id.*

[9] *State v. Buckman, supra* note 6.

[10] See, 2015 Neb. Laws, L.B. 245, § 3; 2007 Neb. Laws, L.B. 296, § 48.

[11] *State v. Buckman, supra* note 6, 267 Neb. at 515, 675 N.W.2d at 381.

[12] See *State v. Buckman, supra* note 6.

[T]he court may vacate and set aside the judgment in circumstances where the DNA testing results are either completely exonerative or highly exculpatory—when the results, when considered with the evidence of the case which resulted in the underlying judgment, show a complete lack of evidence to establish an essential element of the crime charged. . . . This requires a finding that guilt cannot be sustained because the evidence is doubtful in character and completely lacking in probative value. . . . [I]n other circumstances where the evidence is merely exculpatory, the court may order a new trial if the newly discovered exculpatory DNA evidence is of such a nature that if it had been offered and admitted at the former trial, it probably would have produced a substantially different result.[13]

### 2. Whether Results Are Exonerative or Exculpatory

[3] With this understanding, we turn to consideration of whether the DNA testing results exonerated or exculpated Buckman. We recall that postconviction DNA evidence that does not falsify or discredit evidence that was necessary to prove an essential element of the crime does not exonerate the movant.[14] DNA testing results that are not incompatible with trial evidence of the movant's guilt fail to exonerate the movant of guilt.[15] We are also mindful of the definition of exculpatory evidence contained in the DNA Testing Act: "[E]xculpatory evidence means evidence which is favorable to the person in custody and material to the issue of the guilt of the person in custody."[16]

---

[13] *Id*. at 518, 675 N.W.2d at 383.

[14] See *State v. Parmar*, 283 Neb. 247, 808 N.W.2d 623 (2012).

[15] *Id.*

[16] See § 29-4119.

Buckman argues that the DNA testing results contradict the State's theory at trial and create a reasonable doubt about guilt that would have produced a substantially different result at trial. Because the State presented evidence at trial that blood consistent with that of Stawkowski was on the steering wheel cover and floormats of Buckman's car but subsequent DNA testing found no evidence of blood, he contends that the scientific evidence used by the State to place him at the scene of the crime has been discredited.

[4] The results of testing on the steering wheel cover and floormats is best regarded as inconclusive. When DNA test results are either inculpatory, inconclusive, or immaterial to the issue of the person's guilt, the results will not entitle the person to relief under the DNA Testing Act.[17] Although Helligso was unable to detect any blood on the steering wheel cover or floormats, she testified that did not mean an expert who said there was blood present in 1988 was wrong.

Buckman also contends that the DNA testing yielded exculpatory evidence because it excluded him as the source of semen/sperm found on Stawkowski at the time of her death. We disagree that the result fits within the definition of exculpatory evidence. What is important is that evidence must be "material to the issue of the guilt of the person in custody" in order to be exculpatory.[18] Buckman was not charged with a sexual assault, and his exclusion as the source of the semen was not material to whether he was guilty of murder or using a weapon to commit a felony.

We also disagree with Buckman's characterization of the evidence at trial regarding the semen. He called such evidence "exhaustive,"[19] "a great measure of evidence,"[20] and "a

---

[17] *State v. Amaya, supra* note 7.

[18] See § 29-4119.

[19] Brief for appellant at 41.

[20] *Id.*

spotlight [of] the prosecution."[21] The bill of exceptions from the trial spanned over 1,600 pages; fewer than 40 of those pages referred to semen, sperm, or Stawkowski's sexual activity. Forty-six witnesses testified; four of those witnesses provided testimony about semen and Stawkowski's having sexual intercourse. Over 200 exhibits were offered; 5 exhibits related to either Stawkowski's panties or swabs from her vagina and rectum.

The trial record shows that evidence concerning semen was a small part of the overall picture. To begin, the prosecution warned in its opening statement that there was "no indication that [Stawkowski] had been sexually assaulted" or that the semen discovery "has anything to do with this case." Then, Stawkowski's husband testified that he did not have knowledge of Stawkowski's having sexual intercourse with anyone on the day in question. Next, Till, the pathologist, testified that Stawkowski's body was fully clothed, that he found sperm in her vagina, and that the sperm could have been there within 8 hours of her death. After that, Schanfield testified that following testing of the panties extract and vaginal swab extract—which were among a number of items he tested—he was unable to draw any conclusions as to the genetic markers of the person responsible for the semen. Later, Roy offered her testimony about the numerous items of evidence she tested, which included testimony that Buckman was among the 35 percent of the male population who could be the possible semen donor and that the semen she found on the vaginal swab could not have been there longer than 12 hours. Moving to closing arguments, semen was first mentioned by the defense. Finally, in the State's rebuttal argument, the prosecutor told the jury that whether the murderer also committed a sexual assault was "not one of the mysteries of the case that we have to solve." The presence of semen from someone other than Stawkowski's

---

[21] *Id.* at 42.

husband seemed to be more of an unexplained happenstance than a focal point of the prosecution.

Buckman relies on *State v. Parmar*.[22] There, a jury convicted LeRoy J. Parmar of first degree murder. Two eyewitnesses at trial testified that Parmar had physically assaulted the victim and that he was the only male present when the victim was robbed and killed.[23] Subsequent DNA testing on bloodstains found on the victim's bedsheet excluded Parmar as a contributor. Two of the six samples contained mixed DNA from two male contributors—although the male victim was a contributor, Parmar was not. We agreed with the trial court that the DNA testing results did not exonerate Parmar; however, we determined that the court erred in denying Parmar a new trial. We noted that the testing results completely excluded Parmar as a contributor to the DNA samples found on the victim's bedsheet, that the results established the presence of an unidentified male's DNA, and that the results were contrary to the testimonies of two key eyewitnesses against Parmar. We concluded that the DNA testing results tended to create a reasonable doubt about Parmar's guilt and that they were probative of a factual situation different from that testified to by the State's two eyewitnesses against Parmar.

*Parmar* is distinguishable. There, the testimonies of the two eyewitnesses were the key evidence against Parmar and the DNA testing results were probative of a situation contrary to their version of the facts. In the instant case, there was no eyewitness to the murder. Nor was there evidence that Stawkowski had been sexually assaulted at the time of the murder. And as discussed next, a multitude of other circumstantial evidence tied Buckman to the murder.

[5] If DNA testing does not detect the presence of a prisoner's DNA on an item of evidence, such result is at best inconclusive, especially when there is other credible evidence

---

[22] *State v. Parmar, supra* note 14.

[23] See *id.*

tying the defendant to the crime.[24] Evidence at trial established that Buckman was dissatisfied with either the quantity or the quality of drugs he was buying from Stawkowski and that he had threatened to steal drugs from Stawkowski. When Stawkowski's body was found, her purse—which had contained cocaine—was missing. The day prior to the murder, Buckman was trying to sell clothing to get money needed to pay Fisher's babysitter. After the murder, and after Stawkowski's purse containing approximately $2,000 went missing, Buckman spent large amounts of money and still possessed over $600 at the time of his arrest. Hours before the murder, Buckman had a gun in his possession; the same caliber gun was used to shoot Stawkowski. A cellmate of Buckman testified that Buckman bragged of killing Stawkowski over drugs, taking "$4500 of drugs" from her, and using it to pay off debts.

Other evidence tied Buckman to the scene of the murder. Witnesses placed Buckman with Fisher in the hours before and after the murder, and Fisher was picked up on a road near the location of the murder at approximately 1:30 a.m. Buckman was known to wear slippers in public, and slippers were located near the murder scene. Buckman smoked Kool cigarettes and opened his cigarette packages from the bottom. A Kool cigarette butt was found in Stawkowski's car and testing showed that Buckman fell within the 4.8 percent of the African-American population who could have smoked it. A package of Kool cigarettes, opened from the bottom, was located in a field near Stawkowski's car. Stawkowski could not be excluded as the source of blood found on items of clothing that Buckman was wearing at the time of his arrest, on the slippers found near the murder scene, and on the steering wheel cover and floormats of Buckman's car.

In sum, the evidence regarding blood on the steering wheel cover and floormats was inconclusive and the evidence

---

[24] *State v. Amaya, supra* note 7.

excluding Buckman as the source of the semen was not material to the crimes charged. Given all of the other evidence linking Buckman to the crimes, the testing results were not of such a nature that they probably would have produced a substantially different result if offered at trial. We find no error in the district court's findings of fact, and we conclude the court did not abuse its discretion in sustaining the State's motion to dismiss.

## VI. CONCLUSION

Because the district court's factual findings were not clearly erroneous and it did not abuse its discretion in sustaining the State's motion to dismiss, we affirm its judgment.

AFFIRMED.

HEAVICAN, C.J., and FREUDENBERG, J., not participating.